

**FILED**



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

JUN – 8 2016

CLERK, U S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| |
|---|
| [SEALED]<br><br>    Plaintiff–Relators,<br><br>v.<br><br>**[SEALED]**,<br><br>    Defendants |

Civil Action No.:

## SA16CA0523 FB

**Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER INTO
PACER
DO NOT PLACE IN PRESS
BOX**

**JURY TRIAL DEMANDED**

## **COMPLAINT**

SEALED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES of AMERICA** <u>ex rel.</u> **DANIEL MONTES, JR. and ELIZABETH H. HUDSON,**<br><br>     Plaintiff–Relators,<br><br>v.<br><br>**MAIN BUILDING MAINTENANCE, INC.; JXM, INC.; ROBERT A. XIMENES; ELVIRA H. XIMENES; and MARGAUX I. XIMENES,**<br><br>     Defendants | Civil Action No.:<br><br>**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER INTO PACER**<br>**DO NOT PLACE IN PRESS BOX** |

**COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL**

<u>**INTRODUCTION**</u>

1.      The Small Business Administration's Section 8(a) program is an important program for small businesses – particularly those that qualify for one or more disadvantaged business status.  It was created to help such businesses gain access to federal and private procurement contracts.  For Defendants Robert and Elvira Ximenes, however, the nine-year duration of the program was not enough.  Once their business Main Building Maintenance, Inc. no longer qualified for the Section 8(a) program, they set up JXM, Inc., causing Margaux Ximenes to falsely certify that she was in "control" of those businesses in order to continue to enjoy the benefits of the Section 8(a) program.

2.      Throughout its existence, Robert and Elvira have run Main Building Maintenance, which performs janitorial, flooring, landscaping, and other support

{00033234 }

services, primarily on federal procurement contracts at Air Force bases. After Main

Building Maintenance's Section 8(a) eligibility had run out and JXM, Inc.'s began,

Robert and Elvira Ximenes continued Main Building Maintenance's business,

uninterrupted — through JXM as a shell company set up under their daughter's name.

To facilitate that change while minimizing the effect on their business, they took

advantage of another Small Business Administration ("SBA") program: the

Mentor/Protégé Program, through which larger businesses and businesses that had

graduated the Section 8(a) Program could continue to access contracts set aside for

small disadvantaged businesses through the Section 8(a) Program. In so doing,

Defendants made false statements to the United States that JXM was the prime

contractor on hundreds of contracts, and that both JXM and the JXM/Main Building

Maintenance joint venture were controlled by Margaux Ximenes.

      3.     Defendants' false statements concerning eligibility continued regularly,

with yearly false statements to the SBA and false statements to other government

agencies in conjunction with bids for federal procurement contracts. Defendants have

fraudulently concealed this conduct and the falsity of the false claims they were

designed to facilitate.

      4.     Even after JXM's own Section 8(a) Program eligibility ran out in 2010,

Defendants continued to make false representations to the SBA and other government

agencies to obtain access to set-aside contracts and other preferences to which they have

not been entitled. Defendants have made false statements concerning their eligibility for

the SBA's HUBZone program, which was designed to assist businesses in locations

where it has traditionally been difficult to attract business. And they have continued to bid for contracts as a partnership of two small businesses in order to deceive agencies of the federal government about their eligibility for set-aside contracts.

5.     Margaux Ximenes has never had authority over Main Building Maintenance or JXM, or of any joint venture of the two businesses. She has never exercised any level of control approaching the rigorous standard required by federal regulations. As a result, neither JXM nor any joint venture between JXM and Main Building Maintenance were ever eligible for Section 8(a) Program benefits – nor were they eligible to be considered a small business. Defendants' false representations of eligibility and the certifications made to that end are false statements and records material to false claims. Those statements, as well as Defendants' claims for payment under the wrongfully-obtained contracts, are violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

**PARTIES**

6.     Relator Daniel H. Montes ("Montes") is an individual who resides in Donna, Texas. He is the nephew of Robert and Elvira Ximenes, and first cousin of Margaux and John Ximenes.

7.     Relator Elizabeth H. Hudson ("Hudson") is an individual who resides in Donna, Texas.  She is the sister of Elvira Ximenes, sister-in-law of Robert Ximenes, and aunt of Margaux and John Ximenes.

8.     Defendant Robert A. Ximenes ("Robert Ximenes") is an individual who resides in San Antonio, Texas. He is the owner and president of Defendant Main

Building Maintenance, Inc. Together with Elvira H. Ximenes, Robert A. Ximenes also controls JXM, Inc.

9.      Defendant Elvira H. Ximenes ("Elvira Ximenes") is an individual who resides in San Antonio, Texas.  She is an officer of Main Building Maintenance, Inc. and RT Military Ventures, Inc.  Together with Robert A. Ximenes, Elvira H. Ximenes also controls JXM, Inc.

10.     Defendant Margaux I. Ximenes ("Margaux Ximenes") is an individual who resides in Spring Branch, Texas, the daughter of Robert A. and Elvira H. Ximenes. She is the owner, Director, and President of JXM, Inc., and its only officer.

11.     Defendant Main Building Maintenance, Inc. ("MBM") is a company incorporated and headquartered in Texas. Its principal place of business is 111 E. Laurel Blvd., Suite 100, San Antonio, Texas.

12.     Defendant JXM, Inc. ("JXM") is a company incorporated and headquartered in Texas. Its principal place of business is 111 E. Laurel Blvd., Suite 100, San Antonio, Texas.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*  In addition, the False Claims Act specifically confers jurisdiction upon the United States District Court for claims brought under 31 U.S.C. § 3730, pursuant to 31 U.S.C. § 3732(a).

14.     This District Court has personal jurisdiction over Robert Ximenes, Elvira Ximenes, Margaux Ximenes, MBM, and JXM pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and all such parties have sufficient minimum contacts with the United States of America.

15.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because MBM, JXM, L5, and RT Military all transact business in this judicial district, because Robert Ximenes, Elvira Ximenes, Margaux Ximenes, and John Ximenes work for or control such companies in this district, and because the work performed by Garreth Shaw and Ronald Shaw for such companies was performed in this district.

16.     The Relators are unaware of any public disclosure of the information or allegations that are the basis of this complaint. In the event there has been a public disclosure, the Relator is the original source of the information and allegations contained in this complaint. Prior to the filing of this action, the Relators voluntarily provided the United States with information regarding the false claims that are the subject of this complaint as early as March 14th, 2016, when Relator Daniel Montes emailed the Department of Defense as to the allegations herein.

## STATUTORY AND REGULATORY FRAMEWORK

### The False Claims Act

17.     The False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") provides for liability to the United States for, among other acts, knowingly causing the submission of false or fraudulent claims for payment to the United States, knowingly using a false record or making a false statement material to a claim, and conspiring to submit false

claims, use false records, or make false statements. 31 U.S.C. § 3729(a)(1)(A)-(C). Prior to the amendment of the FCA effective May 20, 2009, persons also faced liability for the same violations. 31 U.S.C. § 3729(a)(1)-(3) (2007).

18.     The FCA, 31 U.S.C. § 3729(a)(1), provides that subject to damage limitations specified at 31 U.S.C. § 3729(a)(2), any person who violates the FCA is liable to the United States for treble damages, and for civil penalties of not less than $5,000 and not more than $10,000. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500, to $11,000 for each violation occurring on or after September 29, 1999.

### The Small Business Administration Section 8(a) Program

19.     SBA's Section 8(a) Business Development Program is an important resource for small businesses seeking business-development assistance. Named for Section 8(a) of the Small Business Act, this program ("8(a) Program") was created to help small and disadvantaged businesses compete in the marketplace. Its purpose "is to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1.

20.     The 8(a) Program helps disadvantaged small businesses to gain access to federal and private procurement markets. Under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a)(1)(B) and (C), the Small Business Administration ("SBA") is "empowered, whenever it determines such action is necessary or appropriate:"

(B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns for construction work, services, or the manufacture, supply, assembly of such articles, equipment, supplies, materials, or parts thereof, or servicing or processing in connection therewith, or such management services as may be necessary to enable the Administration to perform such contracts; and

(C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individual[.]

21.     Pursuant to this statutory language, the SBA promulgated regulations that created the Section 8(a) Business Development Program.

22.     The focus of the Section 8(a) Business Development Program is to provide business development support to small, disadvantaged businesses, and allows federal agencies and entities to "set aside" certain contracts for the sole benefit of Section 8(a) program participants.  This process allows small, socially and economically disadvantaged owned and operated businesses to obtain government contracts with little to no competition.  Businesses that are entered into the Section 8(a) Business Development Program are also eligible for small business contracts with the government that are not set aside for Section 8(a) Business Development Program firms.

23.     For purposes of the program, a company must qualify as a small business concern as defined in 13 C.F.R. § 121.  *See* 13 C.F.R. § 124.102(a)(1).  The specific size limits differ based on the North American Industry Classification System ("NAICS") codes of the small business concern, and may be articulated in terms of dollar limits for annual receipts or in number of employees.  *See* 13 C.F.R. § 121.201.  For businesses identified by the NAICS code 561720 for Janitorial Services, for instance, the current limit is $18,000,000 in annual receipts.  13 C.F.R. § 121.201.

24.     As defined by the program, socially disadvantaged individuals are those individuals who have been subject to racial or ethnic prejudice or cultural bias because of their identity as members of a group without regard to their individual qualities. African-Americans, Hispanic Americans, Asian Pacific Americans, Native Americans and Subcontinent Asian Americans are presumed to be socially disadvantaged. *See* 15 U.S.C. § 124.103 (2007).

25.     As further defined by the program, economically disadvantaged individuals are those individuals who are unable to compete in the free enterprise system due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. *See* 15 U.S.C. § 124.104 (2007).

26.     In order to participate in the Section 8(a) Business Development Program, companies are required to apply to and be certified by the SBA. *See* 15 C.F. R. § 124.2 (2007).

27.     To qualify as a Section 8(a) program participant, a company must fulfill various requirements, including the following: (i) socially and economically disadvantaged individuals must unconditionally own at least 51% of the company; (ii) socially and economically disadvantaged individuals must control the company; (iii) the business must fall below certain size thresholds; and (iv) the company must recertify on an annual basis that all of the Section 8(a) requirements, including those concerning ownership and control, still exist. *See* 15 C.F.R. §§ 124.101-102, 124.105-106, 124.112 (1007).

28.    "Control" in the context of Section 8(a) program requirements means that a disadvantaged person has the power to control the company, as well as that such a person actually exercises that authority to control the company.  Further, control includes both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of the company's operations. That is, a company's management and daily business operations must be conducted by one or more disadvantaged individuals.  *See* 15 U.S.C. § 124.106.

29.    Non-disadvantaged persons may be involved in the management of a company, but in order to satisfy the "control" test of Section 8(a), no such non-disadvantaged persons may, among other things: (i) exercise actual control of the company; (ii) receive compensation in any form from the company that exceeds that received by the disadvantaged controller, absent consent of the SBA; or (iii) provide critical financial or bonding support to the company, which directly or indirectly allows a non-disadvantaged individual to significantly influence the company's business decisions. *See* 15 U.S.C. § 124.106 (2007).

**30.**    Once approved by the SBA for the Section 8(a) Business Development Program, a company receives a program term of nine years.  A company must maintain program eligibility during its tenure in the program, and must inform the SBA of any changes that would adversely affect its program eligibility.  The nine year program term may be shortened only by termination, early graduation (including voluntary early graduation) or voluntary withdrawal.  13 C.F.R. § 124.2.

### The Section 8(a) Mentor/Protégé Program

31.     Only Section 8(a) program certified companies can bid on or be awarded

8(a) set aside or 8(a) competitive contracts.  13 C.F.R. § 508(c).  Nonetheless, to

encourage larger companies to provide assistance to eligible Section 8(a) participants,

the SBA created the Mentor/Protégé Program.  *See* 13 C.F.R. § 124.520.

32.     Under the Mentor/Protégé Program, contractors are allowed to benefit

from Section 8(a) contracts by entering into a SBA-approved mentor-mentee agreement

with a Section 8(a)-eligible company.  As a benefit of participation in the

Mentor/Protégé Program, the non-eligible contractor may own an equity interest of up

to 40% in the protégé firm, may receive subcontracted work from the Section 8(a)-

eligible company, which must remain the Prime Contractor, or may enter into a joint

venture with the Section 8(a)-eligible company.  13 C.F.R. § 124.510(a) and 13 C.F.R. §

125.6; 13 C.F.R. § 124.520(d).

33.     To act as a Mentor in the Mentor/Protégé Program, a company must

demonstrate a commitment and ability to assist developing Section 8(a) Business

Development Program companies.  To qualify as a Mentor, the company must

demonstrate that it possesses favorable financial health and good character, that it does

not appear on the federal list of debarred or suspended contractors, and that it can

impart value to a protégé firm due to lessons learned and practical experience gained

because of the Section 8(a) program, or through its knowledge of general business

operations and government contracting.  *See* 13 C.F.R. § 124.530(b).  The Mentor

company generally has no more than one protégé at a time, must submit to the SBA

copies of federal tax returns and other financial statements, and must annually certify that it continues to possess good character and a favorable financial position. *See id.*

34.     To act as a Protégé in the Mentor/Protégé Program, a company must (i) be in the developmental stage of program participation, or (ii) have never received an 8(a) contract, or (iii) have a size that is less than half the size standard corresponding to its primary NAICS code. The company must also be in good standing in the Section 8(a) program, cannot be a Mentor company while a Protégé company, and cannot become a Protégé company with less than six months remaining in its Section 8(a) program term. *See* 13 C.F.R. § 124.520(c).

35.     A Mentor/Protégé Agreement must be submitted by the Mentor and the Section 8(a)-eligible company to the SBA for approval. As a condition for approval and subsequent renewal, the Mentor/Protégé Agreement cannot be a mere vehicle to enable a non-Section 8(a)-eligible company to receive Section 8(a) contracts. 13 C.F.R. § 124.520(e)(2).

36.     If a valid Mentor/Protégé Agreement has been submitted and approved, the Mentor and Protégé may joint venture as a small business for any government procurement, including Section 8(a) sole source contracts and Section 8(a) competitive bid contracts, provided the protégé qualifies as small for the procurement. *See* 13 C.F.R. § 124.520.

37.     To maintain eligibility for the Mentor/Protégé Program, the Protégé firm must include in its annual 13 C.F.R. § 132.403(a) business plan update (i) all technical and/or management assistance provided by the Mentor to the Protégé; (ii) all loans to

and/or equity investments made by the Mentor in the Protégé; (iii) all subcontracts awarded to the protégé by the mentor, and the value of each subcontract; (iv) all federal contracts awarded to the Mentor/Protégé relationship as a joint venture (designating each as an 8(a), small business set aside, or unrestricted procurement), the value of each contract, and the percentage of the contract performed and the percentage of revenue accruing to each party to the joint venture, and (v) a narrative describing the success such assistance has had in addressing the developmental needs of the Protégé and addressing any problems encountered.  *See* 13 C.F.R. § 124.520(g)(1).  The Protégé firm must also report the mentoring services provided by the Mentor it receives, by category and hours.  *See* 13 C.F.R. § 124.520(g)(2).  When the SBA reviews the Protégé's annual 13 C.F.R. § 132.403(a) report for these items, it may decide not to approve continuation of the companies' participation in the Mentor/Protégé Program.  *See* 13 C.F.R. § 124.520(g)(4).

38.     If the SBA determines that a Mentor has not provided to the Protégé firm the business development assistance set forth in its 13 C.F.R. § 124.520(e) written agreement, and if the Mentor does not adequately supply reasons for its failure to provide the agreed-upon assistance or a definite plan to provide it within 30 days of being notified of the SBA's determination, the SBA will terminate the Mentor/Protégé Agreement, make the Mentor ineligible to participate in the Mentor/Protégé Program for a period of two years, and may recommend to government agencies procuring the Mentor/Protégé joint venture's services that they issue a stop work order for every contract.  13 C.F.R. § 124.520(h), (i).  The SBA may also consider a Mentor's failure to

comply with the terms and conditions of an SBA-approved Mentor/Protégé Agreement as a basis for debarment on the grounds, but not limited to, that the Mentor has not complied with the terms of a public agreement under 2 CFR § 180.800(b).  13 C.F.R. § 124.520(i)(2).

### The HUBZone Program

39.     The Historically Underutilized Business Zones ("HUBZone") program was enacted into law as part of the Small Business Reauthorization Act of 1997 to encourage small businesses to locate in areas of the country that traditionally experienced difficulty in attracting business.  The purpose of the program is to spur investment and job growth in areas where both were lacking, and the federal government has a goal of awarding 3% of all dollars for federal prime contracts to HUBZone-certified small businesses.

40.     The program encourages economic development in historically underutilized business zones through the establishment of preferences.  15 U.S.C. § 657a.  Agencies can designate a contract as a HUBZone set-aside, which restricts competition for the contract to only those companies that are HUBZone certified.  15 U.S.C. § 657a(b)(2)(B).  In addition to being eligible for such set-aside contracts, businesses that are certified as HUBZone small businesses enjoy subcontracting opportunities.  HUBZone small businesses also a 10% price evaluation preference in full and open contract competitions; their bids are treated as if 10% lower than those of other businesses.

41.     The SBA has the authority to certify a company as a qualified HUBZone business.  13 C.F.R. § 126.300.  Businesses that are not owned by Indian Tribal Governments must meet four basic eligibility requirements to be certified as a HUBZone business.  13 C.F.R. § 126.200(b).  To be in compliance with the HUBZone program, a business must be a qualified HUBZone both at the time of an initial offer for a particular contract and at the time the contract is awarded.  13 C.F.R. § 126.601(c).

42.     One of the four HUBZone eligibility requirements is that the business must be at least 51% unconditionally and directly owned and controlled by persons who are U.S. citizens, with few exceptions. 13 C.F.R. § 126.200(b)(1).  For purposes of the HUBZone program, the SBA's definition of "control" is similar to that for the Section 8(a) Program.  For the HUBZone program, "control" means "both the day-today management and long-term decision-making authority for the HUBZone" business.  13 C.F.R. § 126.202.  Officers, directors, general partners, managing partners, managing members and managers may exercise control of a HUBZone business, but although key employees may sometimes share significant control of a business, the SBA considers the control potential of such employees on a case by case basis. *Id.*

43.     A second requirement for HUBZone program eligibility is that the business must qualify as a small business.  13 C.F.R. § 126.200(b)(2).  The business must meet 13 C.F.R. § 121.201 size standards for the business's primary industry classification. 13 C.F.R. § 126.203(a).  In addition, at the time of any initial contract offer, the business must be considered small by the SBA for the size standard corresponding to the NAICS code assigned to the contract.  13 C.F.R. § 126.203(b).

44.     A third requirement for HUBZone program eligibility is that the business's principal office must be located in a HUBZone designated as such by regulation.  13 C.F.R. § 126.200(b)(3).  The SBA defines "principal office" as the "location where the greatest number of the concern's employees at any one location perform their work."  13 C.F.R. § 126.103.  In making this determination, a business whose primary industry is service or construction can exclude those employees who "perform the majority of their work at job-site locations to fulfill specific contract obligations."  *Id.*

45.     A fourth requirement for HUBZone program eligibility is that at least 35% of the business's employees must reside in a HUBZone.  13 C.F.R. § 126.200(b)(4).  Businesses that designate all of their employees as job-site employees do not qualify for HUBZone certification.  If no employees work in the office located in a designated HUBZone, the business may not qualify as a HUBZone business.  HUBZone businesses must have a principal office at which one or more employees perform the greatest amount of their work, regardless of the business's industry.

### Statements to the SBA Required for the Section 8(a), Mentor/Protégé, HUBZone, and Other Small Business Programs

46.     As a prerequisite to participation in the Section 8(a) Business Development Program and to further payment under any government contracts subsequently awarded through that program, a firm must apply and qualify for participation in the Section 8(a) Program through a formal SBA-administered application process.  In addition, all Section 8(a) firms must submit annual reviews that the SBA uses to monitor eligibility.

47.     The SBA can revoke a firm's Section 8(a) status during the program term of nine years by "graduating" it early if the agency determines that it no longer meets the criteria for certification.  SBA regulations require firms to inform the SBA of any changes that would adversely affect program eligibility while they are participating in the Section 8(a) program.  The SBA also may terminate a firm from the Section 8(a) program for good cause, such as submission of false information or failure to maintain eligibility requirements.  After a firm loses its Section 8(a) eligibility, it cannot reapply, even if it changes its name or management.  Similarly, after a firm loses Section 8(a) status, the disadvantaged individual upon whom eligibility was based is no longer eligible to qualify another firm.

48.     To ensure that graduated or terminated Section 8(a) firms do not seek to impermissibly retain their Section 8(a) status through the creation of new "shell" entities, the SBA also requires Section 8(a) firms to adhere to various regulations regarding their control by, affiliation with, and subcontracts with other firms and individuals.

49.     Among the SBA reporting requirements is a requirement that a disadvantaged individual seeking Section 8(a) status must disclose whether any of his or her prior employers also serve as principals for the firm seeking Section 8(a) status.

50.     Also among the SBA reporting requirements is a requirement that Section 8(a) firms disclose all officers, directors, management members, and key employees so that the SBA can determine whether the principals of a former Section 8(a) firm (or

principals of another non-eligible firm) are impermissibly controlling an individual claiming disadvantage.

51.      Another SBA reporting requirement is a requirement that Section 8(a) firms disclose other entities with which they share resources and employees so that the SBA can determine whether a Section 8(a) firm is impermissibly affiliated with a non-Section 8(a) firm.

52.      After a firm receives a Section 8(a) contract, it must abide by certain subcontracting limitations based on the type of contract.  For example, in the case of a contract for services, a Section 8(a) firm must perform at least 50 percent of the cost of the contract incurred for personnel with its own employees.

53.      The SBA requires these and other disclosures in part so that it can determine whether a former Section 8(a) firm's principals have sought to retain Section 8(a) status through the use of a another person to serve as a figurehead disadvantaged owner of a new Section 8(a) firm – or alternatively, by using a "shell" Section 8(a) firm as a pass-through while in reality subcontracting all of the work to a Section 8(a)-ineligible individual or firm.

54.      To be certified by the SBA as a HUBZone program business, a business must complete an Online Representations and Certifications Application ("ORCA").  In an ORCA, a business represents and certifies that it is a qualified HUBZone business meeting all four requirements of 13 C.F.R. § 126.200(b).

55.      In addition, a qualified HUBZone business has ongoing obligation to immediately notify SBA of any material change that could affect its eligibility.  13 C.F.R.

§ 126.501. Material changes include, but are not limited to, a change in ownership, business structure or principal office location, or a failure to meet the 35% HUBZone residency requirement. *Id.*

56.     When a qualified HUBZone business submits its initial offer (and, where applicable, final offer) for a government procurement contract, it must certify to the contracting officer (i) that it is a qualified HUBZone small business that appears on the SBA's list of HUBZone businesses; (ii) that there has been no material change in its circumstances since the date of certification shown on the SBA's list of HUBZone businesses that could affect its HUBZone eligibility; (iii) that it qualifies as "small" under the NAICS code assigned to the procurement, and, if the business qualified for the HUBZone program pursuant to 13 C.F.R. § 126.200(b) (i.e., owned by U.S. citizens and not an Indian Tribal Government) (iv) that it will "attempt to maintain" the required 35% of employees who reside in a HUBZone during the performance of a HUBZone contract.

## FACTUAL ALLEGATIONS

### False Statements to the Small Business Administration Material to False Claims

57.     MBM was incorporated on April 8, 1982 in San Antonio, Texas, by Robert Ximenes. Robert Ximenes is its President, and Elvira Ximenes is its Vice President. On July 6, 1989, it was certified by the SBA for the Section 8(a) Program, graduating from the Program on July 6, 1998. It was certified by the SBA as a Small Disadvantaged Business on August 24, 1998, exiting that program on June 2, 2001. MBM performs military family housing maintenance work, hospital housekeeping services, base

custodial services, grounds keeping, caretaker services, facility management services, base management services, floor laying and other floor work, and general construction.

58.     Through the SBA's Section 8(a) Program, MBM, Robert Ximenes, and Elvira Ximenes enjoyed enormous advantages: access to government procurement contracts set aside for small businesses, and access to an even more favorable marketplace of government contracts that were open to bids only from Section 8(a) small businesses.  As a Section 8(a) business, MBM also sought and received "sole source" government procurement contracts – for which it was not required to compete with any competitors at all.  The benefits were so significant that, rather than lose those opportunities, Robert Ximenes and Elvira Ximenes began a fraudulent scheme that would last more than a decade and a half.

59.     Upon graduating from the Section 8(a) program, Robert and Elvira Ximenes continued to aver their eligibility for the advantages the program afforded them through false certifications to the SBA.  They turned to JXM, a company incorporated by Robert Ximenes on December 19, 1994 in San Antonio, Texas.  When incorporated, Robert Ximenes was JXM's only director.  But at some point prior to May 2001, the daughter of Robert Ximenes and Elvira Ximenes, Margaux Ximenes, became JXM's 25-year-old President. On May 23, 2001, JXM was certified by the SBA for the Section 8(a) Program and as a Small Disadvantaged Business.

60.     In JXM's application to the Section 8(a) Program, yearly certifications to the SBA, and in representations to other government agencies that accompanied bids for government procurement contracts, Defendants fraudulently represented to the

United States that JXM was eligible for the Section 8(a) Program.  It was not.  To make it seem that JXM was eligible, Defendants falsely stated to the SBA that Margaux Ximenes was an eligible individual, and that she controlled JXM.  This was untrue—Margaux Ximenes never exercised authority over JXM.

61.     JXM was also ineligible for the Section 8(a) Program because Robert Ximenes and Elvira Ximenes controlled it.  As part of the application process, JXM was required to disclose whether any individual that had been involved with a company that previously had Section 8(a) status had a role in running JXM.  Because Robert and Elvira Ximenes had controlled MBM while it was in the Section 8(a) Program, any other company controlled by Robert Ximenes or Elvira Ximenes could not be eligible for the Section 8(a) Program. Robert Ximenes, Elvira Ximenes, and Margaux Ximenes failed to disclose to the role of Robert Ximenes and Elvira Ximenes in running JXM in JXM's Section 8(a) application to the SBA, falsely stating that no person involved in running JXM had previously controlled a different Section 8(a) business.

62.     Although Defendants switched their focus to JXM in bidding for government procurement contracts in 2001, their business model did not change.  All business continued to be run out of the same office.  Robert Ximenes and Elvira Ximenes continued to run the day to day operations of the companies.  And although Margaux Ximenes qualified as a socially and economically disadvantaged individual, she did not actually exercise any authority over JXM at any time, serving as a figurehead only.

63. Because Margaux Ximenes was the socially and economically disadvantaged individual from whom JXM's proffered Section 8(a) eligibility flowed, she was required to exercise authority at JXM. At no time has Margaux Ximenes participated in setting strategic policy for JXM, managed the company's day-to-day, or administered the company's operations. She has never had "control" of JXM as defined by the SBA for purposes of the Section 8(a) Program.

64. To facilitate the use of JXM's Section 8(a) Program eligibility without disrupting business as it had been conducted by MBM, Defendants made further misrepresentations to the SBA by comingling their businesses even more, employing the Section 8(a) Mentor/Protégé Program. Although a Section 8(a) Program business is permitted to partner with a former Section 8(a) Program business in a joint venture while maintaining access to Section 8(a) Program benefits, the eligible business is required to make decisions on behalf of the joint venture, such as dividing responsibilities between the businesses.

65. Neither Margaux Ximenes nor JXM was a "protégé" – Margaux was brought to the office only to sign documents, and was never trained in running either the business or the joint venture herself. Margaux Ximenes did not control any joint venture between JXM and MBM; Robert Ximenes and Elvira Ximenes continued to control both. Robert Ximenes, Elvira Ximenes and Margaux Ximenes falsely stated to the SBA that the JXM and MBM joint venture was in compliance with Mentor/Protégé requirements. The joint venture's status was approved by the SBA under those false

pretenses, and Defendants successfully bid on many government procurement contracts for which they were not eligible.

66.     JXM graduated from the Section 8(a) Program on May 23, 2010.  At that point, Defendants needed a new way to access the most exclusive of SBA set-aside opportunities.  Robert Ximenes attempted to continue the chain one more link, incorporating RT Military Ventures, Inc. on September 5, 2008.  On or about 2009, Defendants represented on a web site registered by JXM that RT Military was an "affiliation" of MBM and JXM, that MBM and JXM brought dozens of years of experience and knowledge to RT Military, and that with the "structure of MBM, Inc. combined with JXM, Inc.," RT Military had increased strength and financial power.

67.     RT Military's increased strength and financial power were too much for the SBA, however, and RT Military was never certified by the SBA for any special status.  Furthermore, on September 21, 2009, the SBA's San Antonio District Office issued a letter to JXM notifying it that for two contracts for which JXM had bid in May 2009 as a joint venture with MBM, JXM had been disapproved – because of JXM's size. If JXM had run up against the size limits for at least some NAICS codes on its own, surely a combination of JXM and MBM as RT Military could be too large for favorable treatment by the SBA.

68.     Hoping to continue to fly under the radar, Defendants split their forces once again, in name if not in reality, once again bidding for contracts under a litany of banners: JXM, MBM, "JXM Incorporated" (rather than "JXM, Inc."), "JXM Inc./MBM Inc. Joint Venture," "JXM Inc./MBM Incorporated Joint Venture," and even "MBM

Inc./JXM Inc. JV." To help make it appear as though they were two different joint ventures, "JXM Inc./MBM Inc. Joint Venture" and "JXM Inc./MBM Incorporated Joint Venture" used two different addresses on their applications – the latter using an address at 431 6th Street, San Antonio, Texas. Defendants continued to bid on and receive government procurement contracts as qualified small businesses, through false statements of the companies' sizes and false statements that they were not one and the same firm.

69. Defendants continued to hear the siren call of more favorable SBA set-aside programs, however, and so they tried one more stratagem. Before fully committing to the representations that Margaux Ximenes was in control of JXM and that JXM was eligible for the Section 8(a) Program, Robert Ximenes had unsuccessfully sought certification from the SBA that MBM was a HUBZone qualified small business. But just as the JXM construct had allowed Defendants to access set-aside contracts through the Section 8(a) Program for which MBM was no longer eligible, JXM persisted as a possible option for access to HUBZone set-aside contracts.

70. Defendants endeavored to do just that, although JXM was run out of the very same office as MBM, although it employed the same workers, and although like Robert Ximenes and Elvira Ximenes, Margaux Ximenes did not herself reside within a HUBZone as they were defined by the SBA. On March 26, 2012, the SBA certified JXM as a HUBZone business concern.

71. To obtain HUBZone status for JXM, Defendants made false statements that JXM could be qualified as a small business concern in the first place. And on

information and belief, Defendants also made false statements that at least 35% of JXM's workers resided in HUBZone areas, in representations to the SBA for its initial certification, follow-up reports to the SBA, and in each and every contract bid it made to a government agency thereafter when JXM identified itself as a HUBZone-qualified small business concern.

### False Statements to Other Government Agencies Material to False Claims

72.     By the time JXM was graduated from the Section 8(a) Program in May 2010, however, Defendants had stopped relying solely on misrepresentations to the SBA in order to fraudulently obtain government procurement contracts from other government agencies.  Through false statements, Defendants had deceived the SBA into making JXM a Section 8(a) Program-eligible small business from 2001 to 2010, into designating JXM a HUBZone small business concern from March 2012 to the present, and into signing off on most if not all of Defendants' contract bids as a joint venture of JXM and MBM.  That was not enough, however. And in its certifications directly to government agencies offering procurement contracts, Defendants made bolder claims.

73.     From at least October 2007 to the present, Defendants have made thousands of false statements to government agencies in the form of false certifications of Section 8(a) Program and HUBZone Program eligibility. These false statements to the Agricultural Research Service, the Department of State, the Department of Veterans Affairs, the General Services Administration, the Army and the Air Force led directly to the award of federal procurement contracts with those agencies for which Defendants were not actually eligible.

74.     Defendants received hundreds of small business set-aside contracts from the United States through false certifications that JXM and/or MBM or a joint venture qualified as a small business.  Had they not been awarded to Defendants, the small business set-aside contracts would have been awarded to businesses that actually qualified as small businesses.  61 examples of transactions concerning small business set aside contracts that were awarded to Defendants are attached hereto as Exhibit 1.

75.     Defendants received well over one hundred Section 8(a) Program set-aside contracts, including "sole source" contracts, through false certifications that JXM and/or MBM or a joint venture was eligible for the Section 8(a) Program.  Had they not been awarded to Defendants, the Section 8(a) set-aside contracts would have been awarded to businesses for which Section 8(a) benefits were intended by the United States: small businesses controlled by socially and economically disadvantaged individuals who had not yet availed themselves of nine years' worth of Section 8(a) benefits.  In one particularly egregious example, "JXM Inc./MBM Incorporated Joint Venture" bid on and received a $459,364.30 Section 8(a) sole source contract in 2011.  73 examples of transactions involving Section 8(a) sole source contracts are attached hereto as Exhibit 2.

76.     In nearly two hundred instances, Defendants falsely certified to United States agencies that JXM, MBM and/or a joint venture were eligible for the HUBZone Program.  In approximately eighty instances, Defendants falsely certified that JXM was a HUBZone business although the SBA had not yet qualified JXM as a HUBZone business.  In approximately seventy-five instances, Defendants falsely certified directly

to United States agencies that MBM was a HUBZone-eligible business, although it was never qualified as such by the SBA, and although the SBA had explicitly denied an application for same.  By falsely certifying HUBZone Program eligibility, Defendants received preferential treatment in the award of federal procurement contracts by several agencies.  40 examples of transactions in which Defendants represented to government agencies such as the Air Force, Army and Department of Veterans Affairs are attached hereto as Exhibit 3.

### Defendants' False Statements Led to False Claims

77.     In various iterations of their names, JXM and MBM bid for and received hundreds of federal procurement contracts between October 2007 and January 2016. The contracts were for services all over the country, including the states of Delaware, Florida, Illinois, Kansas, Louisiana, Maryland, Mississippi, Missouri, Texas, Wyoming, and even the District of Columbia. Primarily for custodial and construction services, the contracts awarded by United States agencies because of Defendants' false statements were for ongoing, regular services, for which Defendants billed the same United States agencies regularly.

78.     Defendants' claims for payment to United States agencies pursuant to federal procurement contracts were false claims for payment when the contracts themselves were obtained and retained through false statements concerning eligibility. Defendants were paid at least $143,187,652 in base value and exercised options on wrongfully-obtained federal procurement contracts between October 2007 and January 2016.

{00033234 }                                    26

## FIRST CAUSE OF ACTION

## Violation of U.S.C. § 3729(a)(1)(A) (and predecessor version of the Act)

79.    The Relators repeat and re-allege the allegations set forth in the preceding paragraphs.

80.    From at least 2001 to the present, Defendants, together with its agents, employees, and co-conspirators, routinely and knowingly presented, and/or cause to be presented, false and fraudulent claims for services to several United States agencies for the purpose of getting such false and fraudulent claims paid or approved by the United States through false claims of eligibility as a small disadvantaged business.

81.    Through JXM and JXM's joint ventures with MBM, Defendants fraudulently convinced the United States, through the SBA and other agencies, that Defendants were eligible for preferences available through SBA programs, including small business set asides and Section 8(a) Program contracts.  Claims submitted pursuant to contracts awarded under those programs to JXM and its joint ventures with MBM are false claims, because JXM, either alone or through its joint ventures with MBM, was not eligible for those contracts.

82.    Defendants' submission of false claims were knowing, because JXM and the JXM joint ventures with MBM were set up specifically to make an end-run around restrictions on SBA programs.

83.    Defendants had regular reporting requirements to the SBA but failed to disclose the facts that made JXM and its joint ventures with MBM ineligible for SBA programs, including the fact that Margaux Ximenes was not exercising any authority

over JXM and did not control it.  Because they deliberately hid these facts in regular reports to the SBA, Defendants fraudulently concealed their submission of false claims to the United States.

84.     As a result of the Defendants' submission of false claims, the United States, through the Small Business Administration and the Departments of Defense, State, Veterans Affairs, and Agriculture and the General Services Administration have paid numerous false claims and sustained millions of dollars in damages.

## SECOND CAUSE OF ACTION

## Violation of U.S.C. § 3729(a)(1)(A) and (B) (and predecessor version of the Act)

85.     The Relators repeat and re-allege the allegations set forth in the preceding paragraphs.

86.     From at least 2007 to the present, Defendants, together with its agents, employees, and co-conspirators, routinely and knowingly presented, and/or cause to be presented, false and fraudulent claims for services to several United States agencies for the purpose of getting such false and fraudulent claims paid or approved by the United States through false claims of eligibility as a small business in a Historically Underutilized Business Zone ("HUBZone").

87.     Defendants' submission of false claims were knowing, because MBM had specifically been rejected by the SBA as a HUBZone business, and because JXM knew it was not a HUBZone designated business before it sought that designation from the SBA.

88.     In representing to several agencies of the United States that they were HUBZone businesses, Defendants made regular false statements to the United States for each and every contract it awarded Defendants, in the application procedure but also in follow-up representations to those agencies as required by HUBZone regulations. By failing to disclose that they were not eligible for that program, Defendants fraudulently concealed their submission of false claims to the United States. In addition, MBM fraudulently concealed its submission of false claims to the United States by deciding not to revisit the HUBZone eligibility process it had unsuccessfully pursued before, and JXM did not disclose its prior representations to agencies of HUBZone eligibility in the HUBZone application it completed in 2012.

89.     Because the bids of HUBZone-eligible small businesses are given a 10% preference, Defendants' false statements regarding HUBZone eligibility caused harm to the United States by causing it to pay more for services than it otherwise would have paid.

### THIRD CAUSE OF ACTION

### Violation of U.S.C. § 3729(a)(1)(B) (and predecessor version of the Act)

90.     The Relators repeat and re-allege the allegations set forth in the preceding paragraphs.

91.     From at least 2001 through the present, Defendants have routinely and knowingly made false records and statements material to false claims and to get a false claim pair or approved by the United States.

92.     Defendants made false statements in representing to the SBA that JXM was eligible for the Section 8(a) Small Disadvantaged Business Program, and yearly representations to the SBA that JXM remained eligible for that program.  Defendants made false statements in representing to the SBA in annual business plan updates that it the JXM/MBM Mentor/Protégé relationship was kept in compliance of the SBA's regulations of that program.  Defendants also made thousands of false statements to several other government agencies through falsely certifying in contract bids that they were eligible for SBA programs for which they knew they were not eligible.

93.     Defendants knowingly created the false statements for the principal purpose of deceiving the United States.

94.     The SBA relies on regular reports of information to determine whether to investigate whether a business continues to be eligible for SBA programs.  By creating false statements, Defendants fraudulently concealed its other violations of the False Claims Act.

95.     But for the false statements, Defendants would not have been eligible for hundreds of the federal procurement contracts it was awarded; the false statements were material to false claims.  As a result, Defendants frustrated the purposes of the SBA Section 8(a), Small Disadvantaged Business, and HUBZone programs, as well as other small business programs, and the United States paid millions of dollars for services from Defendants for which it would otherwise not have paid.

WHEREFORE, the Relators, on behalf of the United States of America, request that this Court:

a.      Enter judgment holding Defendants liable for a civil penalty, in excess of $11,000 for each violation of the False Claims Act committed by Defendants;

b.      Enter judgment against Defendants for three times the amount of damages, plus interest, sustained by the United States because of Defendants' violations of the False Claims Act;

c.      Award the Relators a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

d.      Award the Relators their expenses, costs, and reasonable attorneys' fees, plus interest, for prosecuting this action; and

e.      Enter such other relief which this Court finds just and equitable.

Respectfully submitted by:

**RELATORS DANIEL MONTES JR. AND ELIZABETH H. HUDSON,**
By their attorneys,

Dated: June 8, 2016

Charles S. Siegel
Texas State Bar No. 18341875
siegel@waterskraus.com

By: /s/ Ketan U. Kharod
Ketan U. Kharod
Texas State Bar No. 24027105
kkharod@waterskraus.com
Caitlyn E. Silhan
Texas State Bar No. 24072879
csilhan@waterskraus.com
WATERS & KRAUS, LLP
3219 McKinney Avenue
Dallas, Texas  75204

214-357-6244 (Telephone)
214-871-2263 (Facsimile)


Thomas M. Greene
Mass. BBO# 210020*
tgreene@greenellp.com
Michael Tabb
Mass. BBO# 491310*
matabb@greenellp.com
Ryan P. Morrison
Mass. BBO# 680238*
rmorrison@greenellp.com
Tucker D. Greene
Mass. BBO# 682943*
tucker.greene@greenellp.com
**GREENE**LLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040 (Telephone)
(617) 507-6559 (Facsimile)

*\* Motions for Admission Pro Hac Vice into the U.S. District Court for the Western District of Texas are currently pending.*