### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES of AMERICA** <br> **ex rel. DANIEL MONTES, JR. and** <br> **ELIZABETH H. HUDSON,** <br><br> Plaintiff–Relators, <br><br> v. <br><br> **MAIN BUILDING MAINTENANCE, INC.;** <br> **JXM, INC.; ROBERT A. XIMENES;** <br> **ELVIRA H. XIMENES; and MARGAUX I.** <br> **XIMENES,** <br><br> Defendants | Civil Action No.: <br> 5-16-CV-00523-JKP-RBF |

### RELATORS' OPPOSITION TO DEFENDANTS' MOTION
### FOR JUDGMENT ON THE PLEADINGS

Defendants' primary argument advanced in their Motion for Judgment on the

Pleadings—that lying to the Small Business Administration ("SBA") to obtain improper entry to

restricted programs under the Act is not cognizable under the False Claims Act ("FCA"), 31

U.S.C. §3729 *et. seq.*—is ludicrous, both factually and legally.  The FCA is the government's

primary litigation tool for recovering losses sustained as a result of fraud, *U.S. ex rel. Marcy v.

Rowan Companies, Inc.*, 520 F.3d 384, 388 (5th Cir. 2008) and the FCA not only covers the

submission of false claims for payment, but also extends to claims paid "when the contract under

which payment is made was procured by fraud."  *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458, 467-

68 (5th Cir. 2009).   Indeed, the primary decision relied upon by Defendants, *United States ex

rel. Guzder v. MKM Engineers, Inc.*, 2009 WL 10697670 (S.D. Tex. Mar. 3, 2009) ("*Guzder I*")

was amended shortly after its issuance and the Southern District subsequently determined that

false statements made to the SBA to obtain entry into its 8(a) Program are viable under a

fraudulent inducement theory. *See United States ex rel. Guzder v. MKM Engineers, Inc.*, 2009 WL 10697658 (S.D. Tex. May 1, 2009) ("*Guzder II''*) at \*2- 3, and *United States ex rel. Guzder v. MKM Engineers, Inc.*, 2010 WL 11595351 (S.D. Tex. January 14, 2010) ("*Guzder III''*) at \*6. This theory of liability, clear from case law, was also codified in 2010 at 15 U.S.C. § 632(w)(1). There is no doubt that the Relators' complaint states an FCA cause of action.

Defendants also belatedly claim that Relators' complaint does not meet the level of specificity required by Fed. R. Civ. P. 9(b). That argument, never raised before, was waived when Defendants filed their answer and failed to preserve the defense. In any event, the specificity requirements applied to an FCA qui tam action are more flexible than the "time, place, contents and identity" standard employed in common law fraud or securities fraud cases. *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188–90 (5th Cir. 2009). To meet the standard, Relators need only provide "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *Id.* at 190. With regard to the three fraudulent schemes alleged by Relators, their complaint goes above and beyond that standard of specificity.

## FACTUAL BACKGROUND

Defendant Main Building Maintenance, Inc. ("MBM") was formed in 1982 by Defendant Robert Ximenes. He served as MBM's president and his wife, Defendant Elvira Ximenes was MBM's Vice President. Complaint, ¶ 57. In December 1994, Robert Ximenes incorporated JXM, Inc. ("JXM"), and for many years served as its sole director. JXM's purported owner was Defendant Margaux Ximenes, Robert and Elvira's daughter, who was only 18 at that time. In May 2001, at the time Defendants began to make false representations to the SBA, Margaux replaced Robert as JXM's president. Complaint, ¶ 59.

During the relevant period, the SBA administered the 8(a) Program, which is intended to promote the business development of companies owned and operated by "socially and economically disadvantaged individuals."  15 U.S.C. §631(f).  Persons admitted into the program are eligible to obtain set-aside, no-bid government contracts, also known as sole source contracts. Complaint, ¶ 58, *see also Guzdar III*, 2010 WL 11595351 at *2.  The entry requirements are stringent.  Among other requisites, the entity must qualify as a small business concern, which limits the annual revenue received and/or the number of employees; at least 51% of the applicant or participant must be unconditionally and directly owned by socially and economically disadvantaged individuals; and the applicant or participant must be controlled by socially and economically disadvantaged individuals.  Complaint, ¶ 27, 13 C.F.R. §§124.101 – 124.106.

 Once certified as eligible for the 8(a) Program, a business can only participate for nine years, and the concern "graduates" from the program at the end of the ninth year.  During its tenure in the Program, a qualified business must annually certify to the SBA that it still meets all of the eligibility requirements.  It must also annually certify that there have been no changed circumstances which could adversely affect the participant's eligibility.  13 C.F.R. §124.112(b).

For the purposes of meeting the ownership and control requirements for the 8(a) Program, any person who has previously participated in the 8(a) Program is not considered a "disadvantaged individual." 13 C.F.R. §124.108(b).  Thus, an individual who was at any time the principal of an 8(a) Program concern cannot control (or be part of the disadvantaged ownership) of a second business seeking to participate in the 8(a) Program.  Complaint, ¶ 48.

Robert and Elvira applied to have MBM participate in the 8(a) Program in 1989, and MBM graduated nine years later.  Complaint, ¶ 57.  When it left the program, MBM no longer had access to lucrative sole source contracts and Robert and Elvira sought for a mechanism to

reacquire access to these valuable "no competitor" contracts.  *Id.* at ¶ 58.  Ultimately, they turned to JXM, the shell corporation they had formed back in 1994.  *Id.* at ¶ 59.

Margaux, who was now 25, was inserted as the president of JXM, and JXM applied to participate in the 8(a) Program with Margaux identified as the socially and economically disadvantaged person who owned and controlled JXM.  *Id.* at ¶ 59.  The application was fraudulent because JXM falsely stated that Margaux controlled JXM, when in fact she never exercised any authority over JXM.  SBA regulations defined "control" as "strategic policy setting" and "day to day management and administration of business operations," *see* 13 C.F.R. § 124.106,  and such responsibilities resided at all times with Robert and Elvira, the principals of MBM.  Complaint, ¶ 60.  The application was also fraudulent because JXM was required to disclose whether any individual who had owned or controlled a prior Section 8(a) concern was involved in JXM.  The application did not disclose Robert or Elvira's involvement.  *Id.* at  ¶61.  Had this fact been disclosed, JXM would have been disqualified from participation.

 Once JXM was certified, it received sole source federal contracts which it otherwise would have been ineligible to seek.  Complaint, ¶ 75.  To obtain, larger, more lucrative contracts, JXM and MBM set up a joint venture under an 8(a) mentor/protégé program.  Such ventures are permissible under the 8(a) Program provided the 8(a) participant controls the venture, and makes decisions on behalf of the joint venture.  Complaint, ¶ 31-32.  These requirements were never honored.  Margaux had limited involvement in the joint venture and JXM did not control the venture or make any decisions for it; Robert and Elvira exercised such authority.  *Id.*, ¶ 65.

Defendants continued to deceive the SBA during the nine years JXM was an 8(a) Program participant.  JXM was required to submit annual reports to the SBA certifying its continued eligibility and to identify any non-disadvantaged persons in control of JXM, which

would have included the principals of a company that had previously been an 8(a) Program participant (such as MBM).  Those annual certifications falsely certified that Margaux controlled JXM when she did not exercise any authority over it and concealed the participation of Robert and Elvira, disclosure of which would have disqualified JXM (and the JXM/MBM joint venture) from participating and receiving set aside contracts.  Complaint, ¶83.

In addition to misrepresenting their eligibility to participate in the 8(a) Program, Defendants engaged in two other schemes to obtain set aside contracts or competitive advantages under SBA programs for which they were not eligible.  In September, 2009, the SBA's San Antonio District Office advised JXM that its joint venture with MBM made it too large to apply for certain SBA set aside contracts.  Complaint, ¶ 67.   To avoid the joint venture from being disqualified from bidding on other contracts because the venture was no longer a "small business," Defendants changed the names the joint venture did business under, using three different name configurations even though the joint venture was unchanged.  *Id.* at ¶ 68.   And to further make these differently named bidders appear to be different entities, they assigned different addresses to the newly denominated enterprises.  In fact, there was only one address and one office for MBM, JXM and their joint venture.  *Id.*  The use of different names hid the fact that JXM and MBM were comingled businesses and only a single enterprise existed.  *Id.*

In the third scheme, MBM and JXM misrepresented their eligibility to obtain competitive benefits under the SBA's HUBZone program, which was designed to encourage economic development in historically underutilized business zones ("HUBZones").  Qualified businesses were eligible for certain set aside contracts and only received a 10% preference in bidding on other federal contracts.  Complaint, ¶¶ 39-40.

MBM lost HUBZone certification in March 2008.[1]  JXM applied for, and received, HUBZone certification in March 2012.  Complaint, ¶ 70.  Yet, both JXM and MBM falsely certified to United States contracting entities that they were HUBZone certified when they were not.  Exhibit 3 to the Complaint identifies approximately two dozen occasions subsequent to 2008 when MBM certified to the Army that it was HUBZone certified in connection with contracts MBM was awarded.  Complaint, ¶ 76.  Similarly, prior to March 2012, JXM certified to the Army and the Department of Veterans Affairs that it was HUBZone certified in connection with numerous federal contracts.  *Id.*, ¶¶ 73, 76, 87-88.  The contracts JXM and MBM received due to their false certification of HUBZone certification caused the United States to pay more for the services provided because of the 10% bidding preference given to HUBZone certified businesses.  *Id.* ¶ 89.

## PROCEDURAL HISTORY

Relators filed their complaint on June 8, 2016 and the Court ordered it unsealed on June 3, 2019.  Defendants were served in August 2019, and an answer was filed for all five defendants on September 16, 2019.  *See* Dkt. # 39, a copy of which is attached as Exhibit A.  The answer raised three affirmative defenses but did not assert that Relators' complaint failed to meet the pleading requirement that the circumstances constituting fraud must be stated with particularity.

An initial scheduling conference was heard before Judge Farrer on November 8, 2019.  Prior to the Conference the Parties submitted a Joint Discovery/Case Management Plan.  *See*

---

[1] Paragraph 69 of the Complaint alleges that MBM had unsuccessfully sought HUBZone certification.  The Small Business Administration web site reports on MBM's "Business Profile" that MBM was HUBZone eligible for a period of time, but only from January 31, 2002 through March 11, 2008.  Although this information is not in Relator's Complaint, the Court can take judicial notice of public records reported on the official website of a federal agency.  *See* https://web.sba.gov/pro-net/search/dsp_profile.cfm?RequestTimeout=60&DUNS=08628018 (last accessed February 7, 2020).

Dkt. # 50, a copy of which is attached as Exhibit B.  Defendants brought two defenses to the

Court's attention: the FCA's statute of limitation and the FCA's public disclosure bar, 31 U.S.C.

§3730(e)(4).  *See* Exhibit B, p.2-3.  Defendants did not disclose any intent to file a motion for

judgment on the pleadings or to contend that the Complaint contained pleading deficiencies.  As

a result of the conference, the Court set a scheduling order requiring any amended pleadings to

be filed by January 8, 2020 and cutting off discovery in July 2020.

Relators served interrogatories and requests for production of documents on the

Defendants on November 27, 2019.  On December 18, 2019, the parties agreed to extend for two

weeks, until Monday, January 13, 2020, the deadline for  Defendants to provide responses to

Relators' discovery requests.

On Friday, January 10, 2020, two days after the deadline set by the Court for amending

the pleadings, Defendants filed their Motion for Judgment on the Pleadings.  On the same date,

Defendants sent responses to Relators' discovery requests, objecting to each request for

production and interrogatory on the ground that the burden and expense to respond to the request

outweighed any likely benefit.  For each request, Defendants reserved the right to respond or

supplement after the Court's ruling on the pending motion to dismiss.

**ARGUMENT**

**I.   WHERE DEFENDANTS MADE FALSE REPRESENTATIONS TO THE SBA TO OBTAIN ACCESS TO CONTRACT OPPORTUNITIES TO WHICH THEY WERE NOT ENTITLED, THEIR REQUESTS FOR PAYMENTS UNDER THOSE CONTRACTS ARE FALSE CLAIMS**

Defendants' primary argument for dismissing the Relators' complaint is that false claims

under the FCA do not include making false representations to the SBA to establish eligibility and

then seeking payment for services provided under contracts the applicant obtained as a result of

the fraudulent application.  Motion, ¶ 6.  According to Defendants, even where an FCA

defendant lied to obtain entry into an SBA program, if the party obtained contracts as an SBA-program participant  and then submitted invoices to the United States for services performed under those contracts,  those requests for payments are not "false claims" under the FCA. Motion, ¶ 29.

Simply, that is not the law in the Fifth Circuit, as was made clear in *U.S. ex rel. Longhi v. Lithium Power Tech, Inc.*, 575 F.3d 458, 467-68 (5th Cir. 2009).  *Longhi* concerned false statements the defendant had made in its proposals to obtain grants under the Small Business Innovation Research program, another federal program that provides economic assistance only to qualified small businesses.  There was no claim that defendants submitted any false claims for payments under the awarded grants.  *Id.* at 467.  The only alleged fraud was that the defendant had made false representations to obtain the grants in first place—similar to Relators' allegation that JXM and MBM (and their principals) made false representations to obtain access to various SBA programs here.

The Fifth Circuit ruled this type of misrepresentation can be "a false or fraudulent statement" under 31 U.S.C. § 3729, and is consequently actionable.

> FCA liability may be imposed "when the contract under which payment is made was procured by fraud." *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.,* 336 F.3d 375, 384 (5th Cir.2003) (citation omitted). This type of FCA claim is characterized as fraudulent inducement. Under a fraudulent inducement theory, although the Defendants' "subsequent claims for payment made under the contract were not literally false, [because] they derived from the original fraudulent misrepresentation, they, too, became actionable false claims." *United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co.,* 491 F.3d 254, 259 (5th Cir.2007) (citing *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 543–44 (1943)).

*Longhi,*, 575 F.3d at 467–68.  The Court recognized that the defendant had completed the work called for by the grant satisfactorily.  Yet the defendant had "blatantly deceived" the program and defendant's ability to deliver the "ends" called for under the contract did "not justify the

8

means it employed to receive the SBIR grants." *Id.* at 472.  The Court sustained the grant of summary judgment in favor of the United States.

Defendants' argument relies heavily on *Guzder I*, Motion, ¶ ¶ 22 – 27, which was decided before *Longhi*.  But even before *Longhi* was decided, the *Guzder* court recognized that false representations made to the SBA to obtain access to the Section 8(a) program could be actionable under the FCA, even if the requests for payment made under the awarded contracts were not improper.  Shortly after *Guzder I* was issued, the court amended its decision in response to objections made by the Relator and the United States (through a Statement of Interest).  It acknowledged that it had not previously considered the fraudulent inducement theory, that the theory applied when a defendant's claims for payment might be accurate but antecedent fraud occurred in obtaining the government contract, *citing U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 502-04 (S.D. Tex. 2003), and that the FCA's legislative history contemplated liability when a contractor's services were provided as claimed but the claimant was ineligible to participate in the program, *citing Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1048 (S.D. Tex. 1998).  *Guzder II,* 2009 WL 10697658 at *3.  It also found support in the Supreme Court's decision in *Marcus v. Hess,* 317 U.S. 537, 543-44 (1943), which it quoted extensively.  (*e.g.* "The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal-payment of government money to persons who had caused it to be defrauded.").

Ultimately, the court concluded that although the Fifth Circuit had not (yet) expressly approved the fraudulent inducement theory, "[i]n light of *Marcus*, it seems reasonable to conclude that Guzder could pursue an FCA claim under the theory of fraudulent inducement." *Guzder II,* at *3.  While the Court found that Guzder's amended complaint did not set forth such

a claim with the requisite specificity, it granted Guzder leave to amend to cure the deficiencies.[2]

*Id* at *4-*5.  And in *Guzder III,* the Court subsequently found that Guzder's  Second Amended

Complaint did sufficiently allege FCA violations with regard to defendants' misrepresentations

to the SBA regarding an applicant's eligibility for the 8(a) Program, observing that "it may be

sufficient to plead that a defendant knowingly solicited contracts for which it was not eligible,

even if it was paid only for work that was actually performed."  2010 WL 11595351 at *4, *7 -

*10.  The court explicitly rejected the defendants' threshold argument that the FCA does not

encompass a claim for misrepresenting one's eligibility for the 8(a) Program.  *Id.* at 6.

     *Guzder II*  and *Guzder III* are consistent with decisions from other District Courts that

have found that false representations to the SBA regarding a concern's eligibility to participate in

the SBA's 8(a) Program are actionable, even if the concern only seeks payment for work actually

and properly performed.  *See*, *e.g. U.S. ex rel. Sansbury v. LB & B Assoc., Inc.* 58 F. Supp.3d 37.

52-57; (D.D.C. 2014); *United States v. R.J. Zavoral & Sons, Inc.*, 894 F.Supp.2d 1118, 1126 (D.

Minn. 2012); *Ab-Tech Const., Inc. v. United States*, 31 Fed. Cl. 429, 433-434 (Cl.Ct. 1994).

Defendants' argument that it cannot be held liable under the FCA for making misrepresentations

(or concealing facts) regarding its eligibility is meritless.[3]

---

[2] *Guzder I* and *Guzder II* both stand for the proposition that if this Court finds that Relators have
not met the requirements of Rule 9(b), the relators should be given leave to amend to add the
necessary details.  In both opinions, even though the Court dismissed all counts of the relator's
complaint, it did so without prejudice and with leave to amend.  *See, Guzder I*, 2009 WL
10697670 at *9 and *Guzder II*, 2009 WL 10697658 at *5.

[3] Defendants also rely upon an unpublished case from the Eastern District of Virginia, *A1
Procurement, LLC v.Thermcor, Inc.*, 2017 WL 9478501 (E.D. Vir. April 4, 2017).  *A1* is
distinguishable on a number of grounds, including that the case was decided on summary
judgment on a complete factual record, that the SBA at all relevant times had knowledge of the
alleged misrepresentations and that the court refused to consider a fraudulent inducement theory
because the relator's complaint did not allege that the defendants made false representation to
gain admittance to the 8(a) Program.  *Id.* at *12 and n. 14.

## II.    RELATORS' COMPLAINT PROVIDED SUFFICIENT DETAIL TO PERMIT DEFENDANTS TO RESPOND TO RELATORS' FCA CLAIMS

### A.    Defendants Waived Their Ability to Challenge the Specificity of Relators' Fraud Allegations

A primary purpose for Rule 9(b)'s requirement that allegations of fraud be pleaded with specificity is to enable a defendant to prepare an effective response and defense to the plaintiff's complaint. *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 522 (5th Cir. 1993).  Here, Defendants had no difficulty preparing an answer within 30 days of the service of Relator's complaint.  *See* Original Answer of Main Building Maintenance, Inc., JXM, Inc., Robert A. Ximenes, Elvira H. Ximenes and Margaux I. Ximenes, a copy of which is attached as Exhibit A.  That answer was required to contain "[e]very defense to a claim for relief" set forth in Relators' Complaint. Fed.R.Civ.P. 12(b).  Their Affirmative Defenses, set forth on Page 16,  however, do not include a defense based on the failure of the Relators to plead their fraud allegations with adequate specificity.[4]  And the deadline for Defendants to have added that defense by amending their answer expired on January 8, 2020.

Having failed to move to dismiss due to the complaint's lack of specificity before filing their answer, and having failed to preserve the defense by including it in their answer, it is settled law that Defendants have waived their right to challenge the adequacy of the Relator's fraud allegations.  As Judge Leisure observed in *Todaro v. Orbit Int'l Travel, Ltd.*, 755 F.Supp. 1229, 1234 (S.D.N.Y.1991):

> The specificity requirements of Fed.R.Civ.P. 9(b) have been imposed to ensure that a defendant is apprised of the fraud claimed in a manner sufficient to permit the framing of an adequate responsive pleading. A party who fails to raise a 9(b) objection normally waives the requirement.

---

[4] This defense was also not identified in the Joint Discovery/Case Management Plan Pursuant to Rule 26(f) and this Court's Order of October 4, 2019, Dkt. # 50 at ¶3b, which also required the Defendants to set forth their defenses in this action.

*quoting, United National Records, Inc. v. MCA, Inc.,* 609 F.Supp. 33, 39 (N.D. Ill. 1984).  *Cf.*

*U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 696–97 (W.D. Tex. 2007)

(refusing to rule on belated motion challenging particularity of relator's non-intervened fraud

claim, citing *Todaro, United National Records* and other authorities).[5]

There is no reason the alleged pleading deficiencies could not have been brought to the

Court's—and the Relators'—attention before the answer was filed or at the time of the Rule 16

conference.  Recognizing Defendants' waiver of their rights to challenge the sufficiency of

Relators' pleading is particularly appropriate because it appears that Defendants deliberately

delayed raising the defense until after the amendment deadline to attempt to obtain an unfair

tactical advantage.  Where Defendants' primary argument for not permitting an amendment is

that the deadline in the Court's Scheduling Order for amending the pleadings has passed, it is

unlikely a coincidence that Defendants filed their motion two days after the deadline expired.[6]

Such gamesmanship should not be encouraged.

---

[5]  S*ee also Avant-Garde, LLC v. Mountain Spa Properties, LLC*, 2011WL 6223936, *1 (D. Ariz.
Oct. 25, 2011) ("it is well settled that a party waives any objection to Fed.R.Civ.P. 9(b)'s special
fraud pleading requirements if not raised at the outset."); *Kujat v. Harbor Freight Tools USA,
Inc.*; 2010 WL 3463928 at *2 (E.D. Mich., Aug. 30, 2010) ("Since Defendant has already
answered the complaint, it apparently had enough information from the allegations to form an
answer, and any objection to the sufficiency of the pleaded allegations is now waived."); *Davsko
v. Golden Harvest Prods.,* 965 F. Supp. 1467, 1474 (D. Kan. 1997) ("A rule 9(b) objection
is waived unless made as a separate motion prior to or concurrent with the filing of a responsive
pleading"); 5C C. Wright & A. Miller, *Federal Practice & Procedure*, § 1394 at 553 (3d ed.
2004 and 2019 Supp.) ("certain defenses or objections are waived if they are not pleaded in the
manner prescribed by a particular rule, for example, Rule 9").

[6] The expiration of the deadline for amending the parties' pleadings is yet another reason why
waiver should be found.  Defendants could have preserved their right to challenge the sufficiency
of Relators' pleadings by amending their answer to include such a defense.  They deliberately
chose to not do so.  They are bound by that tactical decision and their right to assert such a
defense has been extinguished.

### B.    Relators' Complaint Pleads Their FCA Counts in Sufficient Detail

In *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188–93 (5th Cir. 2009) the Fifth

Circuit recognized that the usual "time, place, contents and identity" requirements for pleading

common law or federal statutory fraud claims under Rule 9(b) are not a good fit for pleading

causes of action under the FCA.  The FCA does not require the plaintiff to prove reliance on the

false representation or even damages.  Consequently the specifics of the false representations at

issue are not as important and may not even be necessary to be established at trial, where the

plaintiff is only required to establish the falsity of the disputed claims, not their exact contents.

The Fifth Circuit explicitly recognized that a procedural rule should not be interpreted to require

a plaintiff to plead a level of detail that meets or even exceeds what is required to prevail at trial.

*Id*. at 189-90.  Thus, the Court recognized that while relators could meet Rule 9(b)'s

requirements by alleging the details of actually submitted false claims, their complaints will also

survive if they allege "particular details of a scheme to submit false claims paired with reliable

indicia that lead to a strong inference that claims were actually submitted."  *Id.* at 190.  Relators'

Complaint meets this standard.

1.    Relators' Complaint Leaves Little Doubt that False Claims Were Actually
Submitted In Connection With the Alleged Fraudulent Schemes.

Turning initially to the second requirement identified in *Grubbs*—whether the Complaint

contains indicia that lead to a strong inference that claims were actually submitted—Section I

establishes that if Defendants defrauded the SBA regarding their eligibility for the various

programs at issue, the claims MBM and JXM submitted to be paid for the work done on those

contracts would be false claims.  The Complaint sufficiently alleges, and it is not disputed, that

Defendants were awarded contracts in the SBA programs at issue, and sought payments under

those contracts.  If the schemes alleged by Relators were fraudulent, there is no question claims were presented.

Defendants contend that Relators have not sufficiently identified the contracts improperly awarded to Defendants.  Motion, ¶¶ 27, 30.  But the Exhibits to the Complaint provide detail sufficient to identify the contracts.  For each of the three schemes alleged by the Relators,[7] Relators have provided: the identity of the Defendant who received the contract (i.e. MBM, JXM, or an MBM/JXM joint venture); the federal agency or department who contracted for the services (e.g. Army, Air Force, Veterans Affairs, Public Buildings Service); the location where the services were to be performed (e.g. Warren Air Force Base, WY; Fort Polk, LA; Fort Riley, KS, El Paso, TX,); the type of services to be provided under the contract (e.g. "Housekeeping (custodial, janitorial)"; "Operation of government family housing"); the date the contract or authorization was signed; the effective date of the contract or authorization; the amount the government committed to pay and a transaction number.  This is more than enough information to permit the Defendants to identify the specific contracts at issue.

To require more specificity about the contracts would be akin to demands made by the defendants in *Grubbs* that the relator  provide the exact dollar amounts, billing numbers and dates.  Such details were not needed at the pleading stage to show to a preponderance that fraudulent bills were actually submitted.  *Grubbs*, 565 F.3d at 190.  "To require these details at pleading is one small step shy of requiring production of actual documentation with the

---

[7] Exhibit 1 to the Complaint identifies 61 examples of small business set aside contracts which MBM, JXM or a joint venture comprised of the two entities received based on their representation that the contracting entity was a "small business".  Exhibit 2 identifies 73 examples (out of more than 100) of set aside and sole source contracts which JXM (or a joint venture of JXM and MBM) received because they improperly participated in the 8(a) Program. And Exhibit 3 identifies 40 examples (out of approximately 155 occasions) when MBM or JXM obtained HUBZone contracts when they were either no longer in or had not yet been accepted for the HUBZone Program.  *See* Complaint, ¶¶ 74 -76.

14

complaint, a level of proof not demanded to win at trial and significantly more than any federal

pleading rule contemplates." *Id.*

> 2. <u>Relators have sufficiently alleged particular details of Defendants'
> schemes to submit false claims.</u>

Relators allege three different schemes by Defendants to participate in SBA programs for

which they were not qualified:  (1) JXM's improper admission and participation in the 8(a)

Program; (2) MBM's false representations that it was a HUBZone certified business after it left

the program and JXM's false representation that it was a HUBZone certified business before it

entered the program; and (3) MBM's and JXM's false certification that they were "small"

businesses eligible for SBA small business set aside contracts.  For each of these schemes,

Relators have set forth sufficiently detailed allegations.

**The 8(a) Program Scheme:** Relators allege that JXM's original application and its

annual reports to the SBA were fraudulent because JXM was never controlled by Margaux,

which is what was represented to the SBA in the application and the annual reports.  Complaint,

¶¶ 60, 92.  Relators also allege Defendants deliberately concealed Robert and Elvira's

relationship to JXM because as principals of MBM, a former participant in an 8(a)  Program,

disclosure of their actual role in JXM would have disqualified JXM from being admitted to, and

continuing to participate in, the 8(a) Program.  Complaint, ¶ 61, 92.  Similar false representations

were made to the SBA in connection with the joint venture established between MBM and JXM.

In annual business plan updates JXM, the 8(a) Program participant, falsely certified that it was in

compliance with SBA rules regarding joint ventures, when in fact, contrary to those rules,

MBM's principals made the decisions on behalf of the joint venture and controlled it.

Complaint, ¶¶ 64, 65 and 92.  The Complaint identifies specific requirements relating to

participation in the 8(a) Program, Complaint, ¶¶ 26 – 38, which eligibility requirements

Defendants violated and how they were violated, *Id.* at ¶¶ 60 – 65; and alleges that had Defendants not acted fraudulently, the contracts awarded to JXM and the joint venture would have been awarded to enterprises that actually met the SBA's requirements for participating in the program. *Id.* at ¶ 75.

Defendants contend that Relators' allegations regarding why the representations to the SBA were false are too conclusory, merely stating that Margaux did not control JXM. But the Complaint does set forth facts which support Relators' claim that the Defendants misrepresented who controlled JXM, including that Margaux never exercised any authority over JXM, ¶ 60, the operations of MBM's business did not change, notwithstanding the fact that JXM was supposedly now in control of the government contracts, ¶ 62, JXM and MBM were run out of the same office with the same employees, ¶¶ 62, 70, Robert and Elvira ran the day to day operations of both companies, ¶ 62, Margaux never participated in setting strategic policy of JXM, or its day-to-day operations or administered its operations, ¶63, Margaux who was 25 when she became the president of JXM, was never trained in running either JXM or the joint venture, ¶ 65; and that Margaux was brought to the office only to sign documents, ¶ 65.

The last fact alone, if proven by the Relators, is enough to establish that the representations made to the SBA were fraudulent. Under the SBA regulations, a business is not controlled by a socially and economically disadvantaged person unless she devotes "full-time to the business during the normal working hours of firms in the same or similar lines of business." 13 C.F.R. 124.106(a)(3). If Margaux's involvement in managing JXM was signing documents when needed, she could not have been "in control" of the business as required by the 8(a) Program's regulations.

16

Defendants also fault the Complaint for not specifically identifying which documents submitted to the SBA contained the misrepresentations or the precise contents of the misrepresentation.  Motion, ¶ 33.  But the Complaint states that the misrepresentations were made in JXM's 2001 application to the 8(a) Program, and annual reports and business plan updates that were required to be filed with the SBA between 2002 and JXM's graduation in 2010.  Such detail adequately identifies "how" and "when" the misrepresentations were made. Comparable pleading has been found to provide sufficient particularity in other FCA cases concerning fraudulent Section 8(a) representations.  *See*, *Sansbury*, 58 F. Supp. 3d at 56-57. While the complaint does not quote specific misrepresentations verbatim, by identifying what disclosures were required to be made under the SBA regulations, and why such disclosures could not be accurately stated and still be in compliance with the 8(a) Program's eligibility requirements, Plaintiffs have sufficiently identified what was misrepresented to the SBA.  Under *Grubbs,* Relators are not required to provide additional evidentiary detail.[8]

**The HUBZone Scheme:**  The details of the HUBZone scheme are straight forward. Subsequent to March 2008, MBM was not a HUBZone certified business. Complaint, ¶ 69, *see also* footnote 2, *infra*.  Nor was JXM prior to March 26, 2012.  Complaint, ¶ 70.  Yet, Exhibit 3 identifies numerous HUBZone contracts with federal offices that MBM and JXM obtained as HUBZone certified concerns during the periods they could not participate in the HUBZone

---

[8] Defendants also allege that the Complaint does not adequately distinguish the roles the various defendants played in the fraudulent scheme.  Yet it is clear that the fraudulent misrepresentations were made in the course of SBA filings made by JXM, which Margaux, the disadvantaged person qualified to participate in the Program and JXM's president, had to sign.  The roles played by Robert and Elvira, who are alleged to have controlled all aspects of both MBM and JXM, are also described, including their initiation of the scheme and their control of the joint venture.  Complaint, ¶¶ 59 – 65.  The Complaint explicitly states Robert, Elvira and Margaux made false statements to the SBA with regard to the 8(a) Program scheme.  ¶ 65.  And it alleges that MBM's principals' controlled both MBM and JXM, and that MBM and its resources, including its workers and offices, performed JXM's contracts.  Complaint, ¶¶ 62, 65, 68 and 70.

program.  Complaint, ¶ 76.  MBM's and JXM's applications to the contracting agencies falsely represented that MBM, JXM or the joint venture were HUBZone certified when they were not. For the reasons described above, Exhibit 3 identifies the contracts where the entities misrepresented their HUBZone status, including the date of the contracts or contract authorizations, the contracting agency, the nature of the services provided under the contract and where the contract was to be performed.  This permits Defendants to adequately identify the relevant contract application or bid.

**Misrepresentation of Size Scheme:**  The details of Defendants' misrepresentation of the status of the MBM/JVX Joint Venture as a "small" business are equally straight forward.  On September 21, 2009 the SBA's San Antonio office informed JXM that the MBM/JXM joint venture was too large to qualify as a "small" business in connection with contracts for which it had submitted bids.  Complaint, ¶ 67.  To conceal the fact that the joint venture did not qualify, Defendants submitted bids on behalf of the joint venture under different names, and fictitiously assigned a separate address to one of the re-denominated entities.  *Id.* at ¶ 68.  These tactics worked.  After Defendants received notification of the joint venture's ineligibility, various MBM/JXM joint ventures continued to bid for and receive set aside contracts that were only supposed to be awarded to concerns that actually were "small" according the SBA.  *Id.* at ¶ ¶ 68, 74, Exhibit 1.  Exhibit 1 to the Complaint identifies the contracts and contracting agencies to whom such misrepresentations were made, when improper contract payments were authorized, what services the various joint ventures were supposed to perform and where the contract with the joint venture was supposed to be performed.

18

### C.      Relators Should Be Given an Opportunity to Correct Any Pleading Deficiencies

If the Court finds any merit in Defendants' arguments that the circumstances of the fraud have not been pleaded with particularity, it should allow Relators to correct any deficiencies identified.  When a complaint fails to state a claim, a court should generally give the plaintiff at least one chance to amend before dismissing with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir.2002); *see also Guzder I*, 2009 WL 10697670 at \*9 (granting leave to file a second amended complaint even before recognizing relator's theory of liability in *Guzder II*).  Here, Relators have never amended their complaint. This was not because nothing more can be alleged (since the complaint was filed in 2016 additional investigation has been conducted), but because Relators justifiably believed that enough detail had been pleaded, and no suggestion to the contrary had been  made by Defendants prior to filing their Rule 12(c) motion.

Defendants argue leave to amend should not be granted because the period set by the Court for filing amended pleadings expired two days before Defendants filed their motion. Relators can easily demonstrate "good cause" under the factors this Court uses to evaluate whether a modification to the scheduling order should be allowed under Rule 16(b)(4) to permit amendment.[9]  The most relevant factors concern the timeliness of the request and the potential prejudice in allowing amendment.[10]  With respect to timeliness, Defendants had many

---

[9] The four factors identified by the Fifth Circuit are: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 735 (5th Cir. 2018).

[10] The importance to the Relators of being allowed to amend in the event the Court finds pleading deficiencies is obvious.  As no prejudice to the Defendants has been suggested, the need for a continuance is not an important factor.

19

opportunities to raise a Rule 9(b) defense prior to their Rule 12(c) motion, such as in their Answer, in the list of anticipated defenses in the Rule 26(f) Joint Discovery/Case Management Plan (Document #50, p.2-3), and at the Rule 16 conference.  Even timely objections to Relators' discovery requests would have raised the issue sooner, and before the January 11th deadline.  By deliberately failing to inform Relators of their insufficiency claims, Defendants obviously cannot fault Relators for not requesting amendment earlier.

For similar reasons, having knowingly refrained from raising Rule 9(b) concerns until two days after the amendment deadline, Defendants cannot point to any prejudice.  Indeed, it is Relators who are now prejudiced by Defendants' gamesmanship; responses to Relators' discovery requests, originally due in December, will not be received in sufficient time to complete discovery by the current deadline.

If the current complaint does not satisfy Rule 9(b), there is no valid ground for not allowing Relators to amend.

WHEREFORE, for the reasons set forth above, Defendants' Motion for Judgment on the Pleadings should be denied, or alternatively, Relators should be given leave to amend their complaint in order to cure any pleading deficiencies found by the Court.

Dated: February 7, 2020

RELATORS DANIEL MONTES and
ELIZABETH HUDSON

By their attorneys,

*/s/ Michael Tabb*
Thomas M. Greene
Mass. BBO# 210020*
tgreene@greenellp.com
Michael Tabb
Mass. BBO# 491310*
matabb@greenellp.com
Ryan P. Morrison
Mass. BBO# 680238*
rmorrison@greenellp.com
**GREENE**LLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040 (Telephone)
(617) 507-6559 (Facsimile)
*admitted pro hac vice*

Charles S. Siegel
Texas State Bar No. 18341875
siegel@waterskraus.com
Caitlyn E. Silhan
Texas State Bar No. 24072879
csilhan@waterskraus.com
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, TX 75204
(214) 357-6244 (Telephone)
(214) 871-2263 (Facsimile)

## **CERTIFICATE OF SERVICE**

I hereby certify that, on February 7, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

Dated: February 7, 2020

*/s/ Michael Tabb*
Michael Tabb