## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES of AMERICA** *ex rel.* **ELIZABETH H. HUDSON and DANIEL MONTES, JR.,**<br><br>    Plaintiff–Relators,<br><br>v.<br><br>**MAIN BUILDING MAINTENANCE, INC.; JXM, INC.; ROBERT A. XIMENES; ELVIRA H. XIMENES; and MARGAUX I. XIMENES,**<br><br>    Defendants | Civil Action No.:<br><br>16-CV-00523-JKP-RBF<br><br><br><br>**AMENDED COMPLAINT**<br><br>**Leave to File Granted by Order April 9, 2020** |

### RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

### INTRODUCTION

1.      To promote small business and achieve important societal objectives, Congress has created a number of programs that set aside federal contracting dollars for businesses that meet specific requirements.  The Section 8(a) Business Development Program (the "Section 8(a) Program") administered by the United States Small Business Administration ("SBA") sets aside a number of federal contracts for businesses owned and controlled by socially and economically disadvantaged persons.  Similarly, federal agencies are required to set aside numerous contracts which can only be awarded to "small" businesses, businesses that fall within size limitations established by the SBA.

2.      Defendants Robert Ximenes ("Robert") and Elvira Ximenes ("Elvira") took advantage of both the Section 8(a) Program and small business set aside contracts to

grow their company, Defendant Main Building Maintenance ("MBM"), into a substantial enterprise.  MBM was awarded multi-million dollar contracts for providing janitorial and other services, and administered contracts in several states. But once MBM no longer qualified to obtain these programs' benefits, Defendants used knowing misrepresentations and outright fraud to get contract awards they were not entitled to receive.

3.     Participation in the Section 8(a) Program is strictly limited.  Businesses may only participate in the Program for nine years, and once a concern has participated, the entity's principals may not control any other business that seeks admission.  The SBA is particularly sensitive to preventing Section 8(a) Program benefits from being inappropriately extended through the use of related companies that are operated by figureheads controlled by the principals of prior Section 8(a) Program participants.

4.     Knowing that another company they controlled would not otherwise be able to obtain entry into the lucrative Section 8(a) Program, Defendants knowingly hid the relationship between Robert and Elvira and a second company Robert had incorporated, Defendant JXM, Inc. ("JXM").   Less than three years after MBM had exited the 8(a) Program, Robert and Elvira caused JXM to apply for, and be admitted to, the Section 8(a) Program, and by having their daughter, Defendant Margaux Ximenes ("Margaux"), the ostensible president and CEO of JXM, falsely certify that she was in "control" of JXM.  In its application to the Program and annual updates to the SBA, JXM concealed that Robert and Elvira Ximenes determined the strategic direction of JXM and were responsible for its day to day operations.  Margaux, a woman who could not even

2

balance her own checkbook, had no ability to manage or make decisions for JXM.  Far

from being independent of MBM, JXM was wholly dependent on MBM's employees

and resources.  This, too, was deliberately hidden from the SBA by false certifications

and statements.

5.     Once admitted into the Section 8(a) Program, JXM was able to obtain

federal contracts set aside exclusively for Section 8(a) Program participants, some of

which JXM obtained without any competition.  But for Defendants' fraudulent

inducement to gain JXM's admission into the Program, JXM could not have been

awarded these contracts.  This action seeks to recover for the United States the proceeds

of seven contracts were set aside for participants in the Section 8(a) Program and which

were only awarded to JXM, standing alone or in a joint venture with MBM, as a result

of Defendants' fraudulent conduct.

6.     JXM's participation in the Section 8(a) Program resulted in numerous

contracts being awarded to JXM and its related joint venture.  JXM's tenure was so

successful, that JXM and MBM were no longer "small" in connection with federal

contracts for its primary industry, the provision of janitorial services.  The SBA

informed JXM that it was no longer a "small business" in connection with janitorial

services contracts in September 2009.

7.     Notwithstanding the notification from the SBA, MBM continued to bid on

janitorial services contracts that had been set aside for small businesses. Under the

SBA's affiliation rules, MBM was ineligible because its gross revenue had to be

combined with JXM's revenue for size determination purposes.  Nonetheless, MBM

3

falsely certified that it met the SBA's size limitation.  In addition to the seven Section 8(a) Program contracts, this action also seeks to recover the proceeds of two small business set aside contracts that MBM could not have been awarded but for its false certification of size.

## PARTIES

8.      Relator Elizabeth H. Hudson ("Hudson") is an individual who resides in Donna, Texas.  She is the sister of Elvira Ximenes, sister-in-law of Robert Ximenes, and aunt of Margaux Ximenes.

9.      Relator Daniel Montes, Jr. ("Montes") is an individual who resides in Puerto Escondido, Oaxaca, Mexico.   He is Relator Hudson's son.  He is the nephew of Robert and Elvira Ximenes, and first cousin of Margaux Ximenes.

10.      Defendant Robert A. Ximenes ("Robert") is an individual who resides in San Antonio, Texas. He is an owner and president of Defendant Main Building Maintenance, Inc. Together with Elvira H. Ximenes, Robert controls JXM, Inc.

11.      Defendant Elvira H. Ximenes ("Elvira") is an individual who resides in San Antonio, Texas.  She is an officer of Main Building Maintenance, Inc.  Together with Robert A. Ximenes, Elvira also controls JXM, Inc.

12.      Defendant Margaux I. Ximenes ("Margaux") is an individual who resides in Spring Branch, Texas, the daughter of Robert A. and Elvira H. Ximenes. She is the owner, Director, and President of JXM, Inc., and its only officer.

13.     Defendant Main Building Maintenance, Inc. ("MBM") is a company incorporated and headquartered in Texas. Its principal place of business is 111 E. Laurel Blvd., San Antonio, Texas.

14.     Defendant JXM, Inc. ("JXM") is a company incorporated and headquartered in Texas. Its principal place of business is 111 E. Laurel Blvd., San Antonio, Texas.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*  In addition, the False Claims Act specifically confers jurisdiction upon the United States District Court for claims brought under 31 U.S.C. § 3730, pursuant to 31 U.S.C. § 3732(a).

16.     This District Court has personal jurisdiction over Robert Ximenes, Elvira Ximenes, Margaux Ximenes, MBM, and JXM pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and all such parties have sufficient minimum contacts with the United States of America.

17.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because MBM and JXM transact business in this judicial district, and because Robert Ximenes, Elvira Ximenes, and Margaux Ximenes reside in the District.

18.     The Relators are unaware of any public disclosure of the information or allegations that are the basis of this complaint. In the event there has been a public disclosure, the Relators are the original source of the information and allegations

5

contained in this complaint. Prior to the filing of this action, the Relators voluntarily provided the United States with information regarding the false claims that are the subject of this complaint as early as March 14th, 2016, when Relator Montes emailed the Department of Defense as to the allegations herein.

## STATUTORY AND REGULATORY FRAMEWORK

### The False Claims Act

19.     The False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") provides for liability to the United States for, among other acts, knowingly causing the submission of false or fraudulent claims for payment to the United States, knowingly using a false record or making a false statement material to a claim, and conspiring to submit false claims, use false records, or make false statements. 31 U.S.C. § 3729(a)(1)(A)-(C). Prior to the amendment of the FCA effective May 20, 2009, persons also faced liability for the same violations. 31 U.S.C. § 3729(a)(1)-(3) (2007).

20.     The FCA, 31 U.S.C. § 3729(a)(1), provides that subject to damage limitations specified at 31 U.S.C. § 3729(a)(2), any person who violates the FCA is liable to the United States for treble damages, and for civil penalties of not less than $5,000 and not more than $10,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.  At the time of the filing of this Amended Complaint, civil penalties for each violation of the FCA shall be not less than $11,665 to and not more than $23,331.

### The Small Business Administration Section 8(a) Program

21.     SBA's Section 8(a) Business Development Program is an important resource for small businesses seeking business-development assistance. Named for Section 8(a) of the Small Business Act, the 8(a) Program was created to help small and disadvantaged businesses compete in the marketplace. Its purpose "is to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1.

22.     The Section 8(a) Program helps disadvantaged small businesses to gain access to federal and private procurement markets. Under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a)(1)(B) and (C), the Small Business Administration ("SBA") is "empowered, whenever it determines such action is necessary or appropriate:"

> (B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns for construction work, services, or the manufacture, supply, assembly of such articles, equipment, supplies, materials, or parts thereof, or servicing or processing in connection therewith, or such management services as may be necessary to enable the Administration to perform such contracts; and

> (C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individual[.]

23.     Pursuant to this statutory language, the SBA promulgated regulations defining the requirements for entry and participation in the Section 8(a) Program.  The entry requirements are mandatory.  If a concern is not in fact "owned" *and* "controlled" by a "socially and economically disadvantaged individual," as those terms are defined

by Congress and SBA, the concern cannot participate in the Program and may not reap the Program's benefits.

24.     The focus of the Section 8(a) Program is to provide business development support to small, disadvantaged businesses, and allows federal agencies and entities to "set aside" certain contracts for the sole benefit of Section 8(a) Program participants. This process allows small, socially and economically disadvantaged owned and operated businesses to obtain government contracts with little, and sometimes no, competition.  Businesses admitted into the Section 8(a) Program are also eligible for government contracts that have been set aside exclusively for small businesses.

25.     For purposes of the Section 8(a) Program, a company must qualify as a small business concern as defined in 13 C.F.R. § 121.  *See* 13 C.F.R. § 124.102(a)(1).  The SBA had defined specific size limits to determine whether a concern is considered a "small business" based on the North American Industry Classification System ("NAICS") codes.  For the NAICS codes at issue in this litigation, a concern's annual receipts determine whether the business is "small."  *See* 13 C.F.R. § 121.201.  For example, for businesses identified by the NAICS code 561720 for Janitorial Services, the current limit is $19,500,000 in annual receipts.  *Id.*  In 2001, at the time JXM was accepted into the Section 8(a) Program, the limit was $12,000,000 in annual receipts.

26.     As defined by the program, socially disadvantaged individuals are those individuals who have been subject to racial or ethnic prejudice or cultural bias because of their identity as members of a group without regard to their individual qualities. African-Americans, Hispanic Americans, Asian Pacific Americans, Native Americans

and Subcontinent Asian Americans are presumed to be socially disadvantaged.  *See* 13

C.F.R. § 124.103.

27.     As further defined by the program, economically disadvantaged

individuals are those individuals who are unable to compete in the free enterprise

system due to diminished capital and credit opportunities as compared to others in the

same business area who are not socially disadvantaged.  *See* 13 C.F.R. § 124.104.  Under

SBA regulations, however, a person who has controlled a concern that previously

participated in the Section 8(a) Program "will be considered a non-disadvantaged

individual for ownership or control purposes of another applicant or Participant."  13

C.F.R § 124.108(b)(3).  No such person (or any immediate family member of such a

person) may exercise actual control, or have the power to control, a Section 8(a)

Program applicant or participant.  13 C.F.R. § 124.106(e)(1).

28.     "Control" in the context of Section 8(a) program requirements means that

a disadvantaged person has the power to control the company, as well as that such a

person actually exercises that authority to control the company.  Further, control

includes both the strategic policy setting exercised by boards of directors and the day-

to-day management and administration of the company's operations. That is, a

company's management and daily business operations must be conducted by one or

more disadvantaged individuals.  *See* 15 C.F.R. § 124.106.  And the highest position in

the business, such as the president or CEO, must be a full-time manager who is a

disadvantaged individual.  Such person must possess the requisite management

9

capabilities to operate the Section 8(a) applicant, and devote herself full time to the business during its normal operating hours.

29.     Non-disadvantaged persons may be involved in the management of a Section 8(a) participant, but in order to satisfy the "control" test for the Section 8(a) Program, no such person (or any immediate family member) may exercise actual control or have the power to control the participant.  Nor can such a person (or an immediate family member) provide critical financial support to the company, which directly or indirectly allows the non-disadvantaged individual to significantly influence the company's business decisions. *See* 15 C.F.R. § 124.106(e).  Nor can there be a business relationship with a non-disadvantaged individual or entity which causes such dependence that a Section 8(a) applicant or participant cannot exercise independent business judgment without great economic risk. *See* 15 C.F.R. § 124.106(f)(4).

30.     To remain in the program once accepted, a Section 8(a) Program participant must still meet all of the requirements necessary to enter the Section 8(a) Program, including the ownership and control requirements, and must submit an annual certification to the SBA that it is still in compliance with the eligibility requirement and that there have been no changed circumstance which could adversely affect the participant's program eligibility.  Because SBA does not have the resources to audit or check on every Section 8(a) Program business every year, SBA relies substantially on these yearly representations.

31.     Once approved by the SBA for the Section 8(a) Business Development Program, a company receives a program term of nine years.  The nine year program

10

term may be shortened only by termination, early graduation (including voluntary

early graduation) or voluntary withdrawal.  13 C.F.R. § 124.2.  The nine year term

cannot be extended.

### The Section 8(a) Mentor/Protégé Program

32.     In principle, only Section 8(a) Program certified companies can bid on or

be awarded 8(a) set aside or 8(a) competitive contracts.  13 C.F.R. § 508(c).  An

exception, the SBA's 8(a) Mentor Protégé program allows non-Section 8(a) firms to

work on and financially participate in contracts otherwise set aside for Section 8(a)

participants.  *See*  13 C.F.R. § 124.520.

33.     Under the Mentor/Protégé Program, contractors are allowed to benefit

from Section 8(a) contracts by entering into a SBA-approved mentor-mentee agreement

with a Section 8(a)-eligible company.  A benefit of participation in the Mentor/Protégé

Program is that the non-eligible contractor may enter into a joint venture with the

Section 8(a)-eligible company to pursue Section 8(a) set aside contracts.  13 C.F.R. §

124.520(d).  SBA regulations permit joint ventures between Section 8(a) participants and

non-participants in specified circumstances, but if the venture formed by the concerns

applies for more than three contracts within a two year period, the concerns are deemed

"affiliates," and the entities' revenues are combined for the purposes of determining

whether each of the concerns are still considered "small" businesses.  13 C.F.R.

124.513(h).  Under an approved Mentor/Protégé agreement, the parties' venture can

bid on (and accept) multiple contracts and the parties will not lose their small business

status due to affiliation.  13 C.F.R. 124.520.

34.     To act as a Mentor in the Mentor/Protégé Program, a company must demonstrate a commitment and ability to assist developing Section 8(a) Business Development Program companies.  To qualify as a Mentor, the company must demonstrate that it possesses favorable financial health and good character, that it does not appear on the federal list of debarred or suspended contractors, and that it can impart value to a protégé firm due to lessons learned and practical experience gained because of the Section 8(a) program, or through its knowledge of general business operations and government contracting.  *See* 13 C.F.R. § 124.520(b).  The Mentor company must annually certify that it continues to possess good character and a favorable financial position.  *See id.*

35.     To act as a Protégé in the Mentor/Protégé Program, a company must (i) be in the developmental stage of program participation, or (ii) have never received an 8(a) contract, or (iii) have a size that is less than half the size standard corresponding to its primary NAICS code.  The company must also be in good standing in the Section 8(a) program, cannot be a Mentor company while a Protégé company, and cannot become a Protégé company with less than six months remaining in its Section 8(a) program term. *See* 13 C.F.R. § 124.520(c).

36.     A Mentor/Protégé Agreement must be submitted by the Mentor and the Section 8(a)-eligible company to the SBA for approval.  As a condition for approval and subsequent renewal, the Mentor/Protégé Agreement cannot be a mere vehicle to enable a non-Section 8(a)-eligible company to receive Section 8(a) contracts.  13 C.F.R. § 124.520(e)(2).

37.     If a valid Mentor/Protégé Agreement has been submitted and approved, the Mentor and Protégé may joint venture as a small business for any government procurement, including Section 8(a) sole source contracts and Section 8(a) competitive bid contracts, provided the protégé qualifies as small for the procurement.  *See* 13 C.F.R. § 124.520.  A joint venture created pursuant to a Mentor/Protégé program that seeks to obtain Section 8(a) contracts must have the 8(a) participant managing the joint venture, and an employee of the 8(a) participant must be identified as the project manager responsible for the performance of the contract, and the 8(a) Participant must receive at least 51% of the profits of the venture.  13 C.F.R. § 124.513.

## Statements to the SBA Required for the Section 8(a), Mentor/Protégé and Other Small Business Programs

38.     As a prerequisite to participation in the Section 8(a) Business Development Program and to further payment under any government contracts subsequently awarded through that program, a firm must apply and qualify for participation in the Section 8(a) Program through a formal SBA-administered application process.  The individual who signs the application to enter the Section 8(a) Program certifies that the information provided in the application and supporting documents relating to the applicant and to her disadvantaged status is true and accurate.

39.     In addition, all Section 8(a) firms must submit annual reviews that the SBA uses to monitor eligibility.  The annual reports are also certified by the individual signing on behalf of the participant to be true and accurate.

13

40.     The SBA can revoke a firm's Section 8(a) status during the program term of nine years by "graduating" it early if the agency determines that it no longer meets the criteria for certification.  SBA regulations require firms to inform the SBA of any changes that would adversely affect program eligibility while they are participating in the Section 8(a) program.  The SBA also may terminate a firm from the Section 8(a) program for good cause, such as submission of false information or failure to maintain eligibility requirements.  After a firm loses its Section 8(a) eligibility, it cannot reapply, even if it changes its name or management.  Similarly, after a firm loses Section 8(a) status, the disadvantaged individual upon whom eligibility was based is no longer eligible to qualify another firm.

41.     To ensure that graduated or terminated Section 8(a) firms do not seek to impermissibly retain their Section 8(a) status through the creation of new "shell" entities, the SBA also requires Section 8(a) firms to adhere to various regulations regarding their control by, affiliation with, and subcontracts with other firms and individuals.

42.     Among the SBA reporting requirements is a requirement that a disadvantaged individual seeking Section 8(a) status must disclose whether any of his or her prior employers (or their principals) are involved in the management of the firm seeking Section 8(a) status.  *See* 13 C.F.R. § 124.108(e)(2).

43.     Additional SBA reporting requirements for Section 8(a) firms include that the participant on an annual basis disclose all officers, directors, management members, and key employees so that the SBA can determine whether the principals of a former

14

Section 8(a) firm (or principals of another non-eligible firm) are impermissibly controlling an individual claiming disadvantage. Section 8(a) applicants must also disclose all other entities with which the participant shares resources and employees so that the SBA can determine whether a Section 8(a) firm is impermissibly affiliated with a non-Section 8(a) firm.

44.     After a firm receives a Section 8(a) contract, it must abide by certain subcontracting limitations based on the type of contract.  For example, in the case of a contract for services, a Section 8(a) firm must perform at least 50 percent of the cost of the contract incurred for personnel with its own employees.

45.     The SBA requires these and other disclosures in part so that it can determine whether a former Section 8(a) firm's principals have sought to retain Section 8(a) status through the use of a another person who serves as a figurehead disadvantaged owner of the new Section 8(a) firm – or alternatively, by using a "shell" Section 8(a) firm as a pass-through which directs work and revenues to a firm ineligible to participate in the Section 8(a) Program.

### Improper Certifications of Business Size

46.      15 U.S.C. § 632(w) specifically addresses the penalties for an entity falsely asserting its business size in connection with any effort to obtain a federal contract. Subsection (w)(1) states (emphasis added):

> In every contract, subcontract, cooperative agreement,  cooperative research and development agreement, or grant which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a **presumption of loss to the United States based on the total amount expended** on the contract, subcontract, cooperative

agreement, cooperative research and development agreement, or grant whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

47.     The "[s]ubmission of a bid or proposal for a Federal . . .contract. . .

reserved, set aside, or otherwise classified as intended for award to small business

concerns" and the "[r]egistration on any Federal electronic database for the purpose of

being considered for award of a Federal . . . contract. . . as a small business concern" as

"willful and intentional" acts for the purposes of § 632(w)(1).  *See* 15 U.S.C. § 632(w)(2).

48.     Further, every bid or application for a federal contract is required to have

a certification, signed by the authorized official of the applicant, that the entity qualifies

as a small business concern of the exact size and status claimed by the business concern

for the purpose of bidding on a federal contract.  *See* 15 U.S.C. § 632(w)(3).

## FACTUAL ALLEGATIONS

### Robert and Elvira Ximenes Make Their Daughter, Margaux, the Nominal Head of JXM While Retaining Actual Control of the Entity

49.     MBM was incorporated on April 8, 1982 in San Antonio, Texas, by Robert

Ximenes.  Robert Ximenes is its President, and Elvira Ximenes is its Vice President,

Secretary and Treasurer.  Robert and Elvira are the only two directors of MBM. As early

as 1988, MBM began to obtain government contracts, providing custodial, janitorial and

other services to military bases and other federal facilities in Texas.

50.     In 1989, MBM applied for admission to the Section 8(a) Program.  Its

application identified Robert and Elvira as the economically and socially disadvantaged

persons who owned and controlled MBM, and whose disadvantaged status was the

16

basis for MBM's admission to the Program.  On July 6, 1989, the SBA admitted MBM into the Section 8(a) Program.

51.     MBM graduated from the Program on July 6, 1998.  During the period it was in the Section 8(a) Program, MBM was awarded more than $25.5 million in federal contracts, most of which were contracts set aside for Section 8(a) participants or small businesses, and many of which were single source, non-competition contracts.  Due to its participation in the Section 8(a) Program, MBM's revenue and profits grew dramatically.

52.     MBM's revenues declined sharply after it left the program.  In fiscal year 1998, MBM's last full year in the program, it was awarded close to $8 million in government contracts.  By FY 2000, MBM's contracts had declined to $6.5 million and were lower still in FY 2001, $5.3 million.  Robert and Elvira Ximenes needed to regain the access to government business provided by the Section 8(a) Program to rejuvenate their business.

53.     They turned to JXM, a company incorporated by Robert Ximenes on December 19, 1994 in San Antonio, Texas.  Elvira has told both Relators that Robert and Elvira intended JXM to be a business they set up for the benefit of their two children, Margaux and John.  (The "J" in JXM stands for "John" and the "M" stands for "Margaux".)  When originally formed, however, Robert was the sole director of JXM and its president.  For several years JXM did little or no business and Margaux did not work for the company.

54.     Starting in 1997, Robert began to obtain federal contracts in JXM's name. JXM sought the same type of federal contracts that MBM had obtained and it was indistinguishable from MBM.  Indeed, JXM took over contracts and opportunities that MBM had previously held.  JXM's first federal contract, entered in October 1997, was to provide animal care service for animals kenneled at the Lackland Air Force base in San Antonio, Texas.  MBM had provided the same services at the same base between 1994 and 1996. When the contract came up from renewal in 1997, Robert had JXM bid for it instead of MBM.  Another early contract JXM obtained, in March 2002, was to provide janitorial services to the GSA for federal properties in Eagle Pass, Texas.  MBM held that contract from December 2000, and essentially turned it over to JXM when the contract came up for renewal in 2002.

55.     In addition to taking over contracts formerly performed by MBM, JXM was indistinguishable because the same persons performed the same services for MBM and JXM.  Robert Ximenes was responsible for finding contract opportunities for both MBM and JXM.  Robert and Elvira Ximenes worked together to come up with the bids and responses to Requests for Proposals ("RFPs") necessary to obtain those contracts. When JXM was awarded contracts, Robert and the MBM employees who reported to him, including Scott Barry, managed the work forces that performed the labor required for the contracts.  All revenue from awarded contracts was handled by Elvira Ximenes and staff members at MBM who reported to her.  Elvira handled budgeting for both companies and also oversaw paying both companies' accounts receivables and payrolls. She controlled JXM's expenditures, including the amount paid to JXM's president,

Margaux Ximenes. Elvira repeatedly told the Relators that she "calls the shots" for her companies, referring to both MBM and JXM.

56.     No clerical staff worked exclusively for JXM.  To the extent that JXM reimbursed MBM for the services it provided for JXM, the payments were not set by arms-length negotiations.  MBM determined how much it wanted to be paid by JXM and Elvira arranged for the funds to be transferred.

57.     JXM and MBM also shared the same office space.  This was a necessity for JXM, since it had no office staff of its own.  The two companies' business records were kept in the same location and they shared the same computer system.  During a visit to the offices of both companies, Elvira pointed out to Relator Montes the computer server and back up system she had recently purchased and informed him that the system was used for both companies.

58.     To reobtain access to the Section 8(a) Program, Robert and Elvira had to create the illusion that JXM and MBM were distinct entities, and that neither MBM nor its principals controlled JXM.  Sometime prior to 2001, Robert Ximenes stepped down as the Director and President of JXM (although at all times he served as JXM's registered agent in Texas), and Margaux became its president and sole director.  There were no other identified corporate officers of JXM.  Margaux was less than 25 when she became the principal of JXM.  Robert also transferred whatever equity interest he held in JXM to Margaux and, on information and belief, her brother John.  Neither Margaux nor John paid any consideration for their interest in JXM.  At all relevant times Margaux has held no less than 51% of the ownership interest in JXM.

19

59.     Margaux is singularly ill-equipped to be the president of a company that does millions of dollars of business with the United States.  Prior to becoming the president of JXM Margaux showed no aptitude or interest for business.  Elvira told her sisters, including Relator Hudson, of the difficulties Margaux had staying employed before she was the president of JXM.  She did not last long at any position she held.  The one position she was able to hold for an extended position of time was a clerical job at the San Antonio VA Hospital which she was able to obtain because her uncle, Jose Manuel Hernandez, was an administrator at the hospital.  Margaux's job performance, however, was poor and she could not retain the position, to the great embarrassment of her uncle.

60.     Margaux graduated high school, but has not completed any college courses.  After receiving her diploma she did enroll in several courses at the local junior college, but dropped out after a few weeks.  She also briefly attended the University of Texas at Austin before dropping out.

61.     Prior to becoming JXM's president, Margaux had never performed the type of labor JXM provided to the federal government.  Nor did she have any experience preparing bids, administering contracts or supervising work forces.  Indeed, Elvira complained that Margaux could not even hire or manage her own housekeeper.  Elvira told Relator Hudson that Margaux was so incapable of keeping her own house clean, that Elvira had to hire and replace Margaux's personal housekeepers.  Yet Margaux was supposedly running a company whose primary business was supplying janitorial services.

20

62.     Margaux's math skills are rudimentary.  In 2013, Elvira told her sisters that she unsuccessfully tried to get her bank to instruct Margaux how to keep her checking account balanced. At this point, Margaux supposedly had 15 years of experience running a company that did millions of dollars of business with the United States on an annual basis. Thereafter, Elvira admitted to her sisters that she had to take control of Margaux's personal checking account in the same manner she controlled Margaux's business bank accounts.  Elvira told her sisters that she even wound up taking Margaux's husband Pedro Morey off the account so that Elvira would be the only one controlling Margaux's funds.

63.     While Margaux was growing up, Relator Hudson told Elvira that she was concerned about Margaux's lack of maturity.  Relator Hudson was a high school counselor and had extensive experience with adolescents who required special services for academic and social reasons. When Relator Hudson expressed concern that Margaux might be developmentally delayed and that Elvira might want to have her professionally evaluated, Elvira told her sister that there was nothing wrong with Margaux, she was just "lazy".

64.     Even after Margaux became the president of JXM, Elvira continued to complain to her sisters that Margaux was lazy.  She complained that Margaux was frequently out late at nights and that she was often not up before 1 p.m.   She admitted there was substantial resentment between Margaux and her brother John, who, unlike Margaux, provided useful services for JXM.  John worked for JXM off and on during the relevant period.

65.     Prior to applying to the Section 8(a) Program, the addresses JXM used for federal contracting purposes were the same addresses used by MBM.  Around the time JXM applied to enter the Section 8(a) Program, however, JXM identified a new address for its office, 421 6th Street, San Antonio, TX.  This was never JXM's actual office address.  It was the address of a company operated by one of Robert Ximenes's relatives.  JXM used the address as a mail drop to make it appear that it had a separate existence from MBM.

66.     In fact, Margaux maintained an office at MBM's offices at 1017 N. Main Street, San Antonio.  Prior to 2004, when JXM and MBM moved to new offices at 111 E. Laurel Street, San Antonio, Relator Montes periodically did carpentry work for his aunt and uncle and would meet them at the companies' offices.  During one of these visits, Elvira showed Margaux's office to Relator Montes.  Invariably, however, Margaux was never in—even though Relator Montes visited during normal business hours.  Only on one occasion did Relator Montes find Margaux at the office.  Relator Montes asked Margaux where she had been and what did for the company. Margaux told Relator Montes that she only came to the offices when she had to sign papers for the company and that she had no other responsibilities.

67.     Elvira confirmed to Relator Hudson that the only thing Margaux did for the company was sign papers.  After Margaux married in 2005, Elvira informed Relator Hudson that Margaux no longer even came to the office to sign documents.  Elvira complained that she had to take the papers to Margaux's home to have them signed and that Elvira had to go after 1 p.m. because Margaux usually was not up before then.

22

68.     Although Margaux was technically the president of JXM, Elvira controlled the JXM bank accounts and set the compensation and other benefits Margaux was permitted to take from the company.  Elvira told her sisters that she made sure than Margaux and John each received an equal amount from JXM, noting that if John had his way, Margaux would receive little or nothing because he thought she did not do anything. Had Margaux actually controlled JXM, Margaux, not Elvira, would have decided how JXM funds would be distributed and how much she should withdraw from the company.

**With the Assistance of Robert and Elvira Ximenes, JXM Knowingly Makes False Statements to the SBA to Gain Entry to the Section 8(a) Program**

69.     In early 2001, JXM applied to enter the Section 8(a) Program.  The application was signed by Margaux, as JXM's president, but was prepared for Margaux's signature by Robert and Elvira.  The application contained knowingly false statements that Defendants intended the SBA to rely upon.

70.     The application identified JXM's address as 421 6th Street, San Antonio, TX.  As discussed above, this was never JXM's actual address and was only used by JXM to make it appear that it had a separate existence from MBM.

71.     The application asked whether JXM uses the services or facilities of any other firm in which a principal of JXM has a financial or other interest.  JXM stated that it did not.  In fact, JXM used the services and facilities of MBM—in particular its office space, computer system and employees.  Robert and Elvira Ximenes were undisclosed principals of JXM due to their actual control of JXM and their ability to control JXM.

23

The application failed to disclose the actual relationship between JXM and MBM and JXM's reliance on MBM.

72.     The application asked JXM to identify all owners, directors, management members and officers.  JXM did not identify Robert Ximenes or Elvira Ximenes.  Robert determined which contracts JXM would bid, oversaw the management of the contracts awarded and worked with Elvira to respond to RFPs and determine bids.  Elvira controlled all financial aspects of the company including how much JXM would pay to fulfill the contracts, accounts receivable management and supply ordering, and management of JXM's revenues.  Elvira also determined compensation for JXM's officers and staff, including Margaux and her brother.  Robert and Elvira also set JXM's joint venture strategy, which will be discussed below.  Having overseen the day to day management and administration of JXM as well as setting JXM's strategic policy, Robert and Elvira were required to be identified as part of JXM's management team.

73.     The Section 8(a) application identified Margaux as the President and sole director of JXM.  The application indicated that Margaux devoted full time to JXM's management although she did not devote anywhere near such time to JXM matters.

74.     In response to the portion of the application inquiring which of the applicant's owners, directors, management members and officers had access to the firm's bank account, JXM identified Margaux as having access.  She did not.  Although she was a signatory on the JXM's checking accounts, she only signed the checks Elvira or one of Elvira's staff members put in front of her.  Margaux could not draw a check,

order a payment, review bank records or transfer funds from the JXM bank accounts. The application did not disclose that Elvira had access to JXM's bank accounts.

75.     The application sought information as to whether any person other than Margaux provided financial support, office space or equipment to the firm.  JXM did not disclose that MBM provided its office space for JXM (including Margaux and John's offices), that MBM's clerical and financial staff provided necessary staff functions for JXM and that Elvira and Robert had provided the necessary working capital to start the business.

76.     The application required JXM to identify the individuals who claimed to be socially and economically disadvantaged.  Those were the persons who had to control JXM and unconditionally own at least 51% of the entity in order for JXM to be admitted into the Section 8(a) Program.  The only person identified by JXM was Margaux Ximenes.  Margaux, for the reasons described above, did not control JXM.

77.     Margaux signed the application on behalf of JXM and for herself personally as the disadvantaged person sponsoring JXM.  By signing the application, she certified that the information provided in the application and the supporting documents was true and accurate.  For the reasons set forth above, the statements in the application were not true and accurate, and Margaux and JXM knew (or should have known) it.   Robert and Elvira, who prepared the application for Margaux's signature, also knew the statements in the application were not true or accurate.

78.     From the application and other materials submitted to the SBA, it appeared that Margaux was a socially and economically disadvantaged person who

owned and controlled JXM.  Truthful answers to the application's question would have revealed that Margaux did not control JXM, and also that Robert and Elvira, who had already controlled a Section 8(a) participant (and could no longer by law be considered disadvantaged) controlled the applicant.  Truthful answers would have required the SBA to deny JXM's application.  It had no discretion under its regulation—had it known the truth.

79.     Further, the application hid the relationship between the former Section 8(a) participant, MBM, and JXM.  The application inaccurately depicted JXM as a separate entity from MBM and wholly independent of it.  Had the SBA known that there was a continuing relationship between the two entities and JXM was dependent on MBM, the SBA would have investigated further and discovered the truth, which in turn would have required the SBA to deny JXM's application.

80.     Unaware of the true circumstances, on May 23, 2001, JXM was certified by the SBA for the Section 8(a) Program and as a Small Disadvantaged Business. JXM's false statements in its application fraudulently induced its entry into the program.  As the persons who prepared the application for Margaux's signature, Elvira and Robert caused the false statements to be made to the SBA. Margaux, who signed the application without conducting any investigation into the truth or accuracy of the statements in the application, also caused the false statements to be made to the SBA.

## MBM Enters Into a Mentor/Protégé Agreement With JXM to Obtain Access to Section 8(a) Program Contracts

81.     As described above, once admitted to the Section 8(a) Program, a

participant firm may enter into a Mentor/Protégé agreement with a non-Section 8(a)

firm, which is supposed to provide business development assistance to the Section 8(a)

participant.

82.     Not long after JXM was admitted into the Section 8(a) Program, JXM and

MBM executed a Mentor/Protégé Agreement.   The agreement was approved by the

SBA on March 22, 2002.  The SBA was unaware at the time it approved the agreement

that the principals of MBM controlled JXM or that JXM's entry into the Section 8(a)

Program had been obtained through a fraudulent application.

83.     Although there are several different ways a mentor can provide business

development assistance to a protégé, the most profitable arrangement for MBM was to

create a joint venture with JXM.  This would allow MBM, through the joint venture, to

once again obtain access to contracts that had been set aside exclusively for 8(a)

Program participants.  This, of course, was precisely why Robert and Elvira sought to

place a related enterprise in the Section 8(a) Program.

84.     MBM and JXM formed a joint venture, the JXM Inc./MBM Inc. Joint

Venture (the "JXM JV").  The JXM JV was a partnership between JXM and MBM.  As a

partnership, both JXM and MBM were jointly and severally liable for any liabilities

incurred by the JXM JV.   Pursuant to the terms of the joint venture agreement, MBM

was able to receive a sizable proportion of Section 8(a) contracts while not performing

any services it was not already providing to JXM.

85.     The JXM JV was awarded a number of Section 8(a) set aside contracts

while JXM participated in the Program.  These contracts, which are identified below,

were only awarded to the JXM JV because Defendants acts had fraudulently induced

the SBA to approve JXM's Section 8(a) application.  Pursuant to the terms of the JXM JV,

MBM received a substantial portion of the revenue and profits generated by the

contracts.  MBM could not have received these funds but for its principals' participation

in the fraudulent conduct that resulted in JXM's admittance to the Section 8(a) Program.

**JXM Conceals its Ineligibility to Participate in the Section 8(a) Program in its Annual
Updates to the SBA**

86.     During every year it participated in the Section 8(a) Program, JXM was

required to file an annual update within 30 days of its anniversary date.  The Annual

Updates were prepared by Elvira or Robert Ximenes, but had to be signed by Margaux,

JXM's president.

87.     Every year it participated in the program JXM was required to disclose to

the SBA any changes in the Business Structure or Ownership of JXM that had not been

previously reported to the SBA.  Although Robert and Elvira's control of JXM had never

been disclosed to the SBA, JXM expressly stated in every Annual Update that it had

nothing to disclose.

88.     Margaux signed Annual Updates for JXM for every year between 2002

and 2010 and submitted them to the SBA.  Each year she certified that all of the

information submitted in the 8(a) Annual Update, including attachments and personal financial statements, was "TRUE, CORRECT AND ACCURATE." She also certified that JXM met the eligibility requirement to participate in Section 8(a) Program set out in the SBA's regulations, including the requirement for ownership and control by a disadvantaged person. For the reasons set forth above, these annual certifications were false.

89. In 2005 and 2006, respectively, both Margaux and John married. After Margaux eloped with Pedro Morey in 2005, Elvira had Morey sign documents that renounced any rights to JXM or MBM he would have obtained through his marriage to Margaux. Prior to John's 2006 wedding, Robert and Elvira required his fiancée to execute a pre-nuptial agreement which would have deprived her of any rights to JXM and MBM. But John's fiancée refused. Elvira told her sister that due to this refusal to sign the pre-nuptial agreement, Elvira and Robert required John to relinquish all of his equity in JXM. It was transferred to Margaux. The fact that Elvira and Robert could require John to surrender his equity in JXM and give it to his sister, despite the fact that John actually worked for JXM and performed services for it, is further evidence of Robert's and Elvira's actual control over JXM.

90. After John's wedding, but before JXM graduated from the Section 8(a) Program, Margaux gave birth to her first daughter. After her child's birth, Margaux ceased coming to the office altogether, and devoted full time to raising her daughter. Elvira informed Relator Hudson that Elvira had to go every day to Margaux's house to bring lunch to Margaux and her child and to have any necessary papers signed. This

29

was a permanent arrangement, not a temporary accommodation due to Margaux's maternity.  Elvira told Relator Hudson that Margaux's compensation had not been reduced, even though she performed no real services for the company, and that Elvira made sure that John and Margaux received the same income from the company—even though John no longer held any equity.

91.     Although Margaux had almost entirely eliminated the work hours she devoted to JXM, JXM did not inform the SBA of these changes in its annual updates.  It continued to certify in its annual updates that JXM met all eligibility requirements for a Section 8(a) concern, even though one of those requirements was that its president devote full time to managing the company.

92.     By failing to disclose that non-disadvantaged persons controlled it, and the other information described above JXM concealed its ineligibility to participate in the Section 8(a) Program from the SBA on a continuing basis.  The SBA had no reason to believe the statements in JXM's application or annual report were untrue, inaccurate or false.

**As a Result of Its Fraudulent Entry into the Section 8(a) Program, JXM and the JXM JV Presented False Claims to the United States**

93.     Precisely as Robert and Elvira anticipated, JXM's entry into the Section 8(a) Program dramatically increased JXM's federal contracting business.  In the four years prior to being admitted into the program, JXM performed contracting services for just two Texas military bases, recovering less than $2.4 million, less than $600,000 a year.  Within four years of its entry into the Section 8(a) Program, JXM (or the JXM JV)

had contracted with numerous civilian and military departments of the federal

government, performing jobs in Colorado, Florida, New Mexico, Virginia and

Wyoming, in addition to Texas.  Its revenue increased fourfold.  In subsequent years,

business grew by even greater amounts.

94.     Many of the contracts JXM and the JXM JV were awarded while JXM

participated in the Section 8(a) Program had been set aside opportunities for Section

8(a) Program participants.  As a result of JXM's admission into the Program, JXM or the

JXM JV were awarded the following set aside contracts and presented false claims for

payment to the contracting agency after June 8, 2006.

- The Department of the Air Force awarded JXM JV a contract on April 8, 2005 with a contract value (including options) for over $10,000,000 (Contract ID FA480005C0002) to provide maintenance, repairs and alterations to family housing at Langley Air Force Base in Hampton, VA.  JXM JV submitted claims for payment to the Air Force for approximately $4,003,430.00 from June 6, 2006 through November 2007.

- The Department of the Air Force awarded the JXM JV a sole source contract on September 21, 2006 with an initial value of $1,992,581 (Contract ID FA461306D0009) to provide facility support services including maintenance and carpet replacement at Warren Air Force Base in Laramie, WY.  The scope of the contract and the work ordered expanded and the JXM JV submitted claims for payment to the Air Force on behalf of the contract for $3,805,649 between October 2006 and December 2007.

- The General Services Administration awarded the JXM JV a single source contract on March 30, 2007 with an original value of $ 431,891.28 (Contract ID GS07P07UKD0046) to provide custodial services for federal buildings in Eagle Pass, TX.  The scope of the contract and the work ordered expanded and the JXM JV submitted claims for payment for $1,789,484 between March 2007 and March 2012.  Having been awarded the contract while JXM was participating

31

in the Section 8(a) Program, the JXM JV was permitted to retain this single source contract even after JXM graduated from the Program.

- The Department of the Air Force awarded JXM a contract on April 1, 2003 with an original value of $102,394 (Contract ID F4860803D0002) to provide facility support services for family housing at Warren Air Force Base in Cheyenne, WY.  The scope of the contract and the work ordered expanded. JXM submitted claims for payment to the Air Force for approximately $549,011 between June 6, 2006 and September 30, 2006.

- The Agricultural Research Service ("ARS"), a division of the United States Department of Agriculture awarded JXM a sole source contract with an original value of $52,157.88 (Contract ID AG82HWP060001) to provide heating, plumbing and air conditioning maintenance and repairs to ARS facilities in Laramie, WY.  The scope of the contract and the work ordered expanded over time and JXM submitted claims for payment to ARS for $323,817.56 between July 2006 and April 2007.

- The Department of the Air Force awarded a sole source contract to JXM on December 21, 2007 for $1,042,411 (Contract ID FA461308D0001) to provide Military Family Housing Maintenance at Warren Air Force Base in Cheyenne, WY.  The scope of the contract and the work ordered expanded and JXM submitted claims for payment to the Air Force for $ 2,662,725.52 between January 2008 and June 2009.

- The Department of the Air Force awarded a sole source contract to JXM on December 31, 2008 for $501,836.15 (Contract ID FA461309D0010) to provide Military Family Housing Maintenance at Warren Air Force Base in Cheyenne, WY.  The scope of the contract and the work ordered expanded and JXM submitted claims for payment to the Air Force for $ 3,556,700.72 between January 2009 and February 2010.

95.     JXM (and the JXM JV) would never have been able to receive these contracts had Defendants not fraudulently induced the SBA to admit JXM into the Section 8(a) Program.

96.     Further, when submitting bids for these contracts or responding to RFPs, JXM and the JXM JV expressly stated that they were eligible to bid on Section 8(a) set aside contracts.  These representations were false.  Nonetheless, the contracting agencies relied on these express representations when they awarded the above referenced contracts to JXM or the JXM JV.  The contracting agencies were fraudulently induced to award the above referenced contracts to JXM or the JXM JV.

97.     Each of the claims JXM presented for payment with regard to the above referenced contracts also implicitly represented to the contracting agencies that JXM was eligible to perform services on a Section 8(a) set aside contract.  JXM knew this representation was false for the reasons described above.

98.     The contracting agencies had no reason to believe that JXM's express and implicit representations regarding its eligibility to participate in the Section 8(a) Program were false.

99.     All of the claims for payment presented to the contracting agencies for the contracts identified in paragraph 94 were false claims under 31 U.S.C. § 3729(a).

100.    When JXM or the JXM JV responded to an RFP for the contracts identified in paragraph 94 or otherwise submitted bids or proposals for contracting opportunity, the responses, bids or proposals were signed or approved by Margaux, the president of JXM.  Although they were executed by Margaux, the RFP responses bids and proposals had been put together and approved by Robert and Elvira Ximenes.  Only responses, bids and proposals that had been approved by Robert and Elvira were put before Margaux.  She had no ability to assemble or evaluate such documents on her own and

signed whatever her mother put before her.  Accordingly, Robert Ximenes, Elvira Ximenes and Margaux Ximenes caused the express false statements in the responses, bids and proposals identified above.

101.    Claims for payment that JXM or the JXM JV presented in connection with the contracts identified in paragraph 94 were only submitted after they were approved by Robert and Elvira Ximenes.  As the president of JXM, and the president of the managing venturer of the JXM JV, Margaux was also responsible for the content of such claims, although she relied on Elvira and Robert (or their staffs) to submit billing on behalf of JXM and the JXM JV.  Accordingly, Robert Ximenes, Elvira Ximenes and Margaux Ximenes caused the implicit false statements to be presented to the contracting agencies.  Robert Ximenes, Elvira Ximenes and Margaux Ximenes also caused the false claims JXM presented to the contracting agencies to be presented to the United States.

**JXM and MBM Knowingly Misrepresented Their Status as Small Businesses After They Were Informed by the SBA that They Were Too Large to Apply for Small Business Set Aside Contracts**

102.    JXM graduated from the Section 8(a) Program on May 23, 2010.  JXM and the JXM JV had achieved phenomenal success in attracting government contracts during JXM's nine years as a Section 8(a) participant, capturing multiple multi-million dollar contracts.  Indeed, it was so successful that neither JXM, MBM nor the JXM JV could be properly classified as a "small" business by the time JXM graduated, particularly without the relief from SBA's affiliation rules that were available to the companies through the Section 8(a) Program's Mentor/Protégé exception.

103.    Pursuant to SBA Regulations, a business is considered small for the purpose of obtaining small business set aside contracts if it does not exceed the size standards defined by the SBA in 13 C.F.R. § 121.201.  That regulation, in turn, defines the maximum size limits in terms of numbers of employees or annual receipts in millions of dollars, depending on what NAICS industry code the business falls under. JXM, MBM and the JXM JV each identified their primary business as the provision of Janitorial Services, NAICS Code 561720.  For the years 2008 through 2013, the threshold for NAICS Code 561720 was $16,500,000 in gross revenues from all sources.  (Prior to that, the threshold was $15,000,000).

104.    To ensure that companies do not manipulate the size standards by creating additional entities and then dividing contracts among the different companies, the SBA requires affiliated entities' revenues to be combined for the purposes of determining whether a business is small.  Under the relevant regulations, entities are affiliates when one controls or has the power to control the other, or a third party or parties controls or has the power to control both.  *See* 13 C.F.R. § 121.103(a)(1). Similarly, the SBA recognizes that affiliation exists where one or more officers or directors of one corporation also control the management of one or more concerns.  *See* 13 C.F.R. § 121.103(e).  And the regulation states that individuals or firms that have identical or substantially identical business and economic interests, such as family members, may be treated as one party.  *See* 13 C.F.R. § 121.103(f)   For the reasons described above, Robert and Elvira Ximenes controlled both MBM and JXM.

35

Additionally, they had identical economic and business interests with the firm nominally headed by their daughter.

105.    Defendants attempted to avoid the SBA's affiliation rules by entering into a Section 8(a) Mentor/Protégé Agreement.  A valid Mentor/Protégé agreement could be an exception of the SBA's affiliation rules.  *See* 13 C.F.R. § 121.103(b)(6).  But the exception was limited.  It only prevented a finding of affiliation *solely* because the protégé firm receives assistance from the mentor.  If there were other grounds for finding affiliation, such as management control or identity of interest, the existence of the Mentor/Protégé agreement would not have prevented a finding of affiliation.

106.    Consequently MBM, JXM and any joint venture involving those companies were affiliated entities whose revenues had to be combined to determine whether any of the entities were "small businesses."  In fact, starting in 2008, the combined revenues of MBM, JXM and the JXM JV exceeded the revenue threshold for NCAIS Industry Code 561720, Janitorial Services.  Subsequent to 2008, the entities were ineligible to apply for small business set aside contracts that sought such services until the threshold was raised in January, 2014.

107.    Defendants received unambiguous notice of their ineligibility for such contracts on September 21, 2009, when the SBA's San Antonio District Office informed Defendants that offers the JXM JV made for Section 8(a) federal contracts to provide janitorial and housekeeping services on two army bases had been disapproved because JXM's size was too large to compete for the contracts.  Although JXM claimed that its mentor/protégé agreement protected it from having its revenue combined with MBM's

36

revenue for size determination purposes, the SBA rejected the argument.  If JXM and

the JXM JV were too large to compete for Section 8(a) contracts for janitorial services,

they were also too large to obtain small business set aside contracts for the same NCAIS

code, 561720.

108.    The SBA monitors competitions for Section 8(a) set aside contracts, but it

does not monitor or participate in small business set aside contracts.  Unless specifically

invited to so, such as when a disappointed bidder protests an award to a competitor,

the SBA does not identify which federal contractor are "small" for the purpose of

particular solicitation or contracting opportunities.

109.    Instead, federal contractors are responsible for determining for themselves

whether they meet the size limitations for the various types of contracts they seek.

During the relevant period, entities that intended to compete for federal contracts had

to register with the federal government's Central Contractor Registration and its Online

Representations and Certifications Application ("ORCA").  Within ORCA, the entity

was required to represent and certify which federal contracting programs it was eligible

to participate in, including whether the entity was small in connection with specific

NAICS codes.

110.    Federal agencies relied on the eligibility information each prospective

contractor provided to ORCA as well as specific representations as to eligibility

prospective contractor's made in their offers and responses to RFPs.  Indeed, as

described above, bidders on federal contractors are required to certify their exact

business size and status when seeking to obtain a federal contract.  Contracting agencies

were not expected to, and ordinarily did not, independently determine whether a contractor who had certified its size was actually small.

111.    At all relevant times, JXM, MBM and the JXM JV were registered in the CCR and certified to ORCA that each of the entities was small with regard to contracts for janitorial services under NAICS Code 561720.  Even after receipt of the September 21, 2009 letter from the SBA, neither JXM, MBM or the JXM JV changed their ORCA certifications, instead falsely repeating them.

112.    Defendants ignored the finding by the SBA that JXM and its affiliates were too large to compete for Janitorial Services contracts that were restricted to small businesses.  Indeed, to evade the SBA's finding, JXM and MBM formed a second joint venture in 2011 entitled the MBM Inc./JXM Inc. JV (the "MBM Joint Venture") and obtained a separate DUNS number for the MBM Joint Venture.  The MBM Joint Venture was a partnership between MBM and JXM.  As a partnership, both MBM and JXM were jointly and severally liable for any liabilities incurred by the MBM Joint Venture.

113.    JXM and MBM sought to avoid the SBA's regulation that the entities that participated in a joint venture that had made more than three contract bids within two years had to be deemed affiliates; a loophole in the regulation permitted the same entities to avoid affiliation if they formed a new joint venture which was not awarded more than three contracts within two years.  See 13 C.F.R.§ 121.3(h).  But the loophole, like the mentor/protégé exception, did not prevent the affiliation rules from applying if there were other grounds for finding affiliation, such as management control or identity

of interest.  At all times, JXM and MBM and all of the joint ventures they created were

affiliates for small business size determination purposes.

114.    Notwithstanding notification from the SBA that JXM and the JXM JV were

too large to obtain federal contracts for janitorial services, Defendants were awarded at

least two such contracts.

- MBM was awarded a one year contract (with a one year option) with
  Department of the Army to perform janitorial services at Fort Polk,
  Vernon Parish, Louisiana (Contract ID W9124E10B0004) on December
  14, 2010, which had a contract value, including all options, of
  $2,655,826.80.  MBM presented claims for payment for its services
  under the contract between January, 2011 and December 2011 and was
  ultimately paid $401,427.42.  The solicitation, W9124E -10-B-0004,
  restricted bidding to small business.

- The MBM Joint Venture was one of seven firms awarded a contract, on
  October 25, 2012, from the Air Force to provide hospital asceptic
  management services at as many as 52 medical treatment centers on
  Air Force bases across the country (Contract ID FA8052-13-D-0006) for
  one year with a possibility of four additional options, with a potential
  value to all awardees of $217,257,839 (including options).  The MBM
  Joint Venture presented claims for services it performed on this
  contract from October 2012 through March 2019, and has been paid
  $53,654,575 for its work.  The solicitation (FA8052-12-R-0004) expressly
  stated the contract awarded would be a small business set aside.

115.    When MBM or the MBM Joint Venture submitted their bids and responses

to RFPs in connection with the above-referenced small business set aside contracts, each

document expressly stated that MBM or the MBM Joint Venture was a small business in

connection with the size limitations governing the proposed contract.  They had made

similar representations in ORCA.  These representations were false.  Neither MBM or

the MBM Joint Venture was properly considered small in relation to contracts for

custodial services under NAICS code 561720.  The contracting agencies, however, relied

on these express representations.  The contracting agencies were fraudulently induced to award the above referenced contracts to MBM and the MBM Joint Venture.

116.    Each of the claims MBM presented for payment on its own account or as the managing venturer in the MBM Joint Venture with regard to the above referenced contracts implicitly represented to the contracting agencies that MBM and / or the MBM Joint Venture was eligible to perform services on a small business set aside contract. MBM knew these representations were false for the reasons described above.

117.    Every claim for payment presented by MBM or the MBM Joint Venture for work performed on the small business set aside contracts identified in paragraph 114 was a false claim for the purposes of 31 U.S.C. § 3729(a).

118.    When MBM or the MBM Joint Venture responded to an RFP for the contracts identified in paragraph 114 or otherwise submitted bids or proposals for those contracting opportunities, the responses, bids or proposals were signed and certified by Robert Ximenes, as the president of MBM.  Margaux, as the president of one of the joint venturers, should have reviewed those documents relating to proposals made by the MBM Joint Venture.  Robert, Elvira and Margaux were also responsible for the representations on ORCA regarding the various entities meeting the small business size limitations for NAICS Code 561720.  Robert, Elvira and Margaux either knew, or should have known but for their reckless disregard, that the entities did not meet the size requirements for NAICS Code 561720.  Accordingly, Robert Ximenes, Elvira Ximenes and Margaux Ximenes caused the express false statements in the responses, bids and proposals identified above and in the ORCA database.

40

119.    Claims for payment that MBM or the MBM Joint Venture presented in connection with the contracts identified in paragraph 114 were only submitted after they were approved by Robert and Elvira Ximenes.  Accordingly, Robert Ximenes and Elvira Ximenes caused the implicit false statements regarding size limitation compliance to be presented to the contracting agencies.

**FIRST CAUSE OF ACTION — SECTION 8(a) PROGRAM FRAUD**

**Violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) (and predecessor version of the False Claims Act)**

120.    The Relators repeat and re-allege the allegations set forth in the preceding paragraphs.

121.    Defendants, together with their agents, employees, and co-conspirators, took the actions described above to obtain JXM's entry into the Section 8(a) Program when they knew that JXM was not eligible to enter the Program, that the disadvantaged person on whom JXM's eligibility was based did not control JXM, and that the persons who actually controlled JXM were not disadvantaged persons.  They fraudulently induced the SBA to accept JXM as a Section 8(a) participant.  Thereafter, the Defendants fraudulently concealed JXM's ineligibility from the SBA, including filing false and inaccurate annual updates.  Each of the Defendants either made or caused to be made false statements that were material to false claims.

122.    As a result of the Defendants' fraud, JXM and the JXM JV were awarded Section 8(a) contracts which they were not entitled to receive and which they could have never been awarded but for Defendants' fraudulent conduct.  All claims for

payment that JXM and the JXM JV presented to the United States in connection with those contracts were false claims.  Robert Ximenes, Elvira Ximenes, Margaux Ximenes and MBM caused those false claims to be made.  MBM, as a partner in the JXM JV, is liable for any liabilities owed by the JXM JV.

123.    As a result of the Defendants' actions, the United States has been damaged in an amount equal to the amount paid on the false claims presented by JXM and the JXM JV.

**SECOND CAUSE OF ACTION-FALSE CERTIFICATION OF BUSINESS SIZE**

**Violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) (and predecessor version of the False Claims Act)**

124.    The Relators repeat and re-allege the allegations set forth in the preceding paragraphs.

125.    At all times, JXM, MBM and any joint ventures between them were affiliated entities for the purpose of determining their size and whether they met the size limitations for small businesses.  At all times, the combined revenue of all of these entities had to be considered in connection with determining whether any of the entities were considered small in connection with federal contracts.

126.    In September 2009, the Defendants were informed by the SBA that as joint venturers, JXM and MBM were too large to be considered a small business in connection with the pursuit of any federal contract seeking services under NAICS Code 561720, Janitorial Services.

127.    Notwithstanding notice from the SBA, MBM and JXM did not change their ORCA designations with regard to NAICS Code 561720.  Further, Robert Ximenes certified on bids for contracts for janitorial services that MBM and the MBM Joint Venture were "small."  These certifications were false.

128.    As a result of the false certifications, MBM and the MBM Joint Venture received small business set aside contracts to provide janitorial services.  MBM and the MBM Joint Venture would not have received such contracts but for the false certifications regarding size.

129.    All claims for payment MBM and the MBM Joint Venture presented to the United States for the small business set aside contracts were false claims.  Robert Ximenes made false statements regarding size that were material to these false claims.  Elvira Ximenes, who was the treasurer of MBM and who controlled the finances of JXM, could have prevented the false statement by Robert Ximenes but took no action.  She caused the false statements material to the false claims to be made.  JXM, a partner in the MBM Joint Venture, is jointly liable for any of the liabilities of the MBM Joint Venture.

130.    As a result of the Defendants' actions and pursuant to 15 U.S.C. § 632(w), the United States has been damaged in the amount it paid on the false claims presented by MBM and the MBM Joint Venture.

## THIRD CAUSE OF ACTION

## Violation of 31 U.S.C. § 3729(a)(1)(C) (and predecessor version of the False Claims Act)

131.     The Relators repeat and re-allege the allegations set forth in the preceding paragraphs.

132.     JXM, MBM, and their principals, Robert Ximenes, Elvira Ximenes and Margaux Ximenes, have conspired to violate §§ 3729(a)(1)(A) and (a)(1)(B) of the False Claims Act by hiding each others' roles in the companies and in the administration of their government contracts.  They have knowingly acted in concert to obtain benefits reserved for qualified small businesses to MBM and JXM, knowing that such entities were not entitled to such benefits. As a result, millions of federal contracting dollars were diverted from deserving firms and federal policies for business development were thwarted.

133.     But for the parties' conspiracy, the improper diversion of small business contracting dollars could not have occurred.

134.     As a result of the Defendants' conspiracy, the United States has been damaged in the amount it paid on the false claims presented by JXM, MBM, the JXM JV and the MBM Joint Venture.

WHEREFORE, the Relators, on behalf of the United States of America, request that this Court:

a.      Enter judgment holding Defendants liable for a civil penalty, to the greatest extent permitted, for each violation of the False Claims Act committed by Defendants;

b.      Enter judgment against Defendants for three times the amount of damages, plus interest, sustained by the United States because of Defendants' violations of the False Claims Act;

c.      Award the Relators a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

d.      Award the Relators their expenses, costs, and reasonable attorneys' fees, plus interest, for prosecuting this action; and

e.      Enter such other relief which this Court finds just and equitable.

Respectfully submitted by:

**RELATORS ELIZABETH H. HUDSON**
**AND DANIEL MONTES JR.,**
By their attorneys,

Dated: April 30, 2020

/s/ Michael Tabb
Thomas M. Greene* (Mass. # 210020)
tgreene@greenellp.com
Michael Tabb* (Mass. # 491310)
matabb@greenellp.com
Ryan P. Morrison* (Mass. # 680238)
rmorrison@greenellp.com
Tucker D. Greene* (Mass. # 682943)
tucker.greene@greenellp.com
**GREENE**LLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040 (Telephone)
(617) 507-6559 (Facsimile)
*admitted pro hac vice*

Charles S. Siegel
Texas State Bar No. 18341875
siegel@waterskraus.com
Caitlyn E. Silhan
Texas State Bar No. 24072879
csilhan@waterskraus.com
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, TX 75204
(214) 357-6244 (Telephone)
(214) 871-2263 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that, on April 30, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

Dated: April 30, 2020                    /s/ Michael Tabb
                                         Michael Tabb