## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES of AMERICA** <br> **<u>ex rel.</u> ELIZABETH H. HUDSON. and** <br> **DANIEL MONTES, JR,** <br><br> Plaintiff–Relators, <br><br> v. <br><br> **MAIN BUILDING MAINTENANCE, INC.;** <br> **JXM, INC.; ROBERT A. XIMENES;** <br> **ELVIRA H. XIMENES; and MARGAUX I.** <br> **XIMENES,** <br><br> Defendants | Civil Action No.: <br> 5-16-CV-00523-JKP-RBF |

### RELATORS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

This Court dismissed the original complaint filed by Relators Elizabeth Hudson and Daniel Montes, Jr. without prejudice because that complaint showed "only a possibility that the Defendants made fraudulent representations to the SBA in order to benefit from SBA programs long after their eligibility expired," April 9, 2020 Order (ECF. No. 67) at 6.

The Relators have cured that flaw.  The Amended Complaint ("AC")

- identifies nine specific set aside contracts that Defendants Main Business Maintenance, Inc. ("MBM") and JXM, Inc. ("JXM") and related entities were awarded by federal agencies and the payments they received, AC, ¶ ¶ 94, 114;

- describes why the entities were not eligible to receive the contracts, AC, ¶ 41-43, 54-57, 78-79, 92, 101-106, and how each of the Defendants deliberately concealed the disqualifying information from the government, AC, ¶¶ 58, 65-66, 69-79, 86-88; 112-115, 118-119;

- identifies the specific misrepresentations made to the Small Business Administration ("SBA") and the governmental contracting entities, AC, ¶¶ 70-76, 87-88; 91; 111, 115-116;

1

- describes how governmental entities relied upon that information to award the contracts or give JXM and MBM access to contracts they otherwise could not bid upon, AC, ¶¶ 78-80, 92, 110, 115, 128; and

- describes how Defendants Robert and Elvira Ximenes controlled JXM, AC, ¶¶ 54-56, 68, 72, 89 and why Defendant Margaux Ximenes did not, AC, ¶¶ 59-62, 64, 66-68 90-91.

Consequently, Defendants no longer contend that Relators have failed to state with particularity the circumstances of the frauds they allege.[1]  Instead Defendants' renewed motion for judgment on the pleadings[2] raises two new grounds for dismissal,[3] both of which are meritless.  First, Defendants contend the Amended Complaint does not satisfy the materiality requirement of the False Claims Act ("FCA").  Yet the complaint details misrepresentations Defendants knowingly made to the SBA because Defendants knew that if they disclosed the true facts, they would have never been able to obtain contracts reserved for participants in the SBA's Section 8(a) Program.   As to Relators' claims that Defendants misrepresented the small business status of JXM and MBM, Congress has made a legislative decision that such misrepresentations are material. *See* 15 U.S.C. § 632(w)(1) (establishing a presumption of loss to the United States of the "total amount expended on the contract.").

Defendants' lack of scienter argument is no stronger.  The Amended Complaint alleges Defendant Margaux Ximenes made misrepresentations to the SBA that she personally knew to

---

[1] Although Defendants recite at length the requirements of Fed.R.Civ.P. 9(b), they do not identify any failure of the Relators to identify the "who, what, when, where and how" of the alleged frauds.

[2] Defendants have moved to dismiss under Rule 12(c) but no answer to the Amended Complaint has been filed. The motion is better viewed as a motion to dismiss for failure to state a claim for relief under Rule 12(b)(6).

[3] Defendants also seek to dismiss Relators' claim that Defendants conspired to violate the FCA.  *See*, Defendants' Motion for Judgment on the Pleadings (ECF No. 71) ("Motion"), ¶ ¶ 52, 66. However, since Defendants' sole ground is their erroneous belief that the Amended Complaint fails to allege a viable FCA claim for violating the FCA, their argument fails.  A claim for violating the FCA conspiracy statute, 31 U.S.C. § 3729(a)(1)(C) only requires pleading "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (quotations and citations omitted).  Relators have met that hurdle.

be false. Further, she certified the truth and accuracy of her responses to SBA inquiries without doing any investigation or review, the very definition of acting in reckless disregard of the truth or falsity of information. *See*, 31 U.S.C. §3729(b)(1)(A)(iii).

Undoubtedly because they recognized the weakness of their arguments, Defendants open their Motion with a fusillade of misconduct allegations against Relator Montes. Yet the qui tam provisions of the FCA were conceived to effectuate the principle of "setting a rogue to catch a rogue" *Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 213 (9th Cir.1991), *citing* Cong. Globe, 37th Cong. 3d Sess. 955–56 (1863) (remarks of Sen. Howard). The act is designed to uncover fraud through actions by private persons motivated by the "strong stimulus of personal ill will or the hope of gain." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 949 (1997), *quoting United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 (1943); *see United States v. Texas Tech University*, 171 F.3d 279, 293 (5th Cir. 1999). With their detailed showing of Relators' personal ill will, Defendants seek to prejudice this Court's impression of the merits of the case--but all it really shows is that the FCA is functioning here as intended. In footnote 1 of the Motion, Defendants all but concede that this background information, and the 23 exhibits they have attached, have no relevance to the merits of their arguments. This "background" (and the corresponding exhibits) must be ignored.[4]

## PROCEDURAL AND FACTUAL BACKGROUND

A.     The Original Complaint and the Court's Dismissal Without Prejudice

Relators' original complaint alleged that the Defendants had made a series of false representations to the SBA and other United States contracting entities to obtain federal contracts for which they were not otherwise eligible. Defendants answered the complaint and Magistrate

---

[4] This Court, of course, cannot consider on any material outside of the complaint's allegations to decide Defendants' motion. *Gines v. DR Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012).

Judge Farrer set a discovery schedule.  On the eve of the date Defendants were supposed to respond to Relators' interrogatories and requests for production of documents, Defendants moved for judgment on the pleadings under Rule 12(c).  Defendants argued that their alleged misrepresentations to obtain access to restricted contracting programs was not actionable under the FCA because there was no allegation that any misrepresentations were made in the claims for payment they presented to the United States.  They also argued the Complaint did not meet Rule 9(b)'s specificity requirement.

Relators' opposition to the Rule 12(c) motion (and a Statement of Interest filed by the United States) explained that even if there were no express or implied false statements in Defendants' claims for payment, their misrepresentations to obtain a contract or access to a government program could be the basis of FCA liability under a fraudulent inducement theory. "Under a fraudulent inducement theory, although the Defendants' subsequent claims for payment made under the contract were not literally false, because they derived from the original fraudulent misrepresentation, they, too, became actionable false claims." *U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d 458, 467-68 (5th Cir. 2009) (internal citations, quotation marks, and brackets omitted).  Confronted with this precedent, Defendants withdrew the argument.

Concerning Defendants' generic Rule 9(b) argument, the Court found the original complaint "lacks sufficient detail," Order at 6, and granted Relators leave to amend.  An Amended Complaint was served on April 30, 2020.

B.      Relevant Allegations of the Amended Complaint

The allegations of the Amended Complaint relevant to Defendants' materiality and lack of scienter arguments concerning each fraudulent scheme identified by the Relators are set forth below.

1.      Defendants' false representations to the SBA allowed them to profit from contracts they could not have otherwise been awarded.

Defendants Robert and Elvira Ximenes are the directors and officers of MBM, a company whose principal business is the provision of janitorial and other maintenance services to military bases and other federal facilities. AC, ¶ 49.  From 1989 to 1998, MBM participated in the Section 8(a) Program, a program created by Congress and administered by the SBA to assist the development of businesses owned and controlled by socially and economically disadvantaged persons.  AC, ¶¶ 49-51.[5]  Due to its entry into the Program, MBM was eligible to obtain government contracts set aside exclusively for Section 8(a) participants.  AC, ¶ 24.

Entry into the 8(a) Program is strictly monitored by the SBA to ensure participants are owned and controlled by disadvantaged persons. AC, ¶¶ 3. 23.  Applicants submit an application to the SBA to confirm they meet the statutory and regulatory requirements.  AC, ¶¶ 38, 70-77.  When an application reveals that an applicant is ineligible, the SBA must deny entry into the Program; it has no discretion.  AC, ¶ 78. Further, participants are required to certify annually that they continue to meet the program's eligibility requirements.  AC, ¶ 30, 39, 88.  If the SBA learns a participant is no longer (or never was) eligible, it must institute termination proceedings.[6]  15 U.S.C. § 636(j)(10)(J)(i).

---

[5] When Congress created the Section 8(a) Program, it expressly found that "the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy;" that "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups;" and that "such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from such concerns."  15 U.S.C. § 631(f)(1)(A), (D) and (F). The Section 8(a) Program was created to accomplish these objectives by promoting "the development of small business concerns owned and controlled by socially and economically disadvantaged persons so that such concerns can compete on an equal basis in the American economy." 15 U.S.C. § 631(f)(2)(A).  *See also*, 13 C.F.R. § 124.1, AC, ¶¶ 1, 21.

[6] Pursuant to § 636(j)(10)(J)(i), the SBA is required to evaluate a participant's continued participation in the Program whenever it receives "specific and credible information" alleging that the participant is not eligible.  If the SBA finds that the participant is ineligible as a result of that evaluation, the SBA is required to institute a termination proceeding.  *Id.*  The SBA has no discretion.

Participation in the Section 8(a) Program is limited to a maximum of nine years, AC, ¶ ¶ 3, 31. To stop principals from improperly extending the Program's limits, the SBA has strict rules and procedures to prevent such persons from operating another Section 8(a) concern through a corporate shell or a figurehead disadvantaged owner.  AC, ¶¶ 3, 41-43, 45.  Persons who have previously qualified a business for the Program are not disadvantaged persons for the Program's ownership and control tests, AC, ¶ 27; 13 C.F.R. § 124.108(b)(3).  Consequently, no such person (or any immediate family member of such a person) may exercise control over another Section 8(a) applicant or participant.  AC, ¶ 27, 13 C.F.R. § 124.106(e)(1).

Due to their interest in MBM, Robert and Elvira were barred from controlling a second business that participated in the Section 8(a) Program.  AC, ¶ ¶ 4, 58. When MBM's government contracting revenues declined after it graduated from the Program, however, they decided to have JXM, a company Robert had incorporated years earlier, apply for the Program, knowing they would have to conceal Robert, Elvira and MBM's affiliation with JXM.  AC, ¶¶ 52, 53, 58. Robert transferred his financial interest in JXM to his daughter, Margaux, and the application filed with the SBA portrayed Margaux as the disadvantaged person who owned and controlled JXM.  AC, ¶¶ 58, 76.  In reality, Margaux's role at JXM was limited; according to Elvira, Margaux did little work for the company, AC, ¶ 64, 66-68, 90.  Robert and Elvira were the persons who controlled JXM's operations and set its business strategy, AC, ¶¶ 55-56, 68, 72, 89.

JXM's application for entry into the 8(a) Program, which Robert and Elvira prepared (and Margaux signed), contained numerous false and misleading representations.

- It failed to disclose that MBM provided office space, equipment (including a computer system) and financial support (including the clerical and financial staff necessary to operate the business) to JXM, AC, ¶¶ 71, 75;

- It failed to disclose that Elvira and Robert Ximenes provided financial support to JXM, including the necessary working capital to start the business, AC, ¶ 75;

- It failed to identify Elvira and/or Robert Ximenes as management members or officers of JXM, even though Elvira and Robert determined which contracts JXM would bid on, prepared the bids and responses to government Requests for Proposals ("RFPs"), oversaw the management of any contracts awarded, and controlled all financial aspects of the company, including how much would be bid on various contracts and even how much compensation Margaux, the president of the company, would be paid, AC, ¶ 72;

- It falsely stated that Margaux devoted full time to JXM's management, AC, ¶ 73;

- It stated that Margaux had access to the firm's bank account when Margaux could not draw a check, order a payment, review bank records or transfer funds, AC, ¶ 74

- It failed to disclose that Elvira had full access to JXM's bank account, AC, ¶ 74;

- It falsely identified Margaux as the sole person who controlled JXM, AC, ¶ 76;

- It falsely reported JXM's address and failed to disclose that JXM shared offices with MBM, even though Margaux's personal office—as the president of JXM—was also part of the offices shared with MBM.  AC, ¶¶ 65-66, 70.

When she signed the application, Margaux certified to the SBA that the information in the application was true and accurate.  AC, ¶¶ 38, 77.  Margaux had personal knowledge that much of misinformation identified above was false.  AC, ¶¶ 65-66, 70, 72-75, 76.  To the extent she was unaware that matters identified above were false, she took no steps to verify any of the information before she certified its accuracy.  AC, ¶¶ 78, 80.

Based on the information provided, the SBA approved JXM's application to enter the Section 8(a) Program.  AC, ¶ 78.  Had the application been filled out accurately, the SBA would have rejected the application because Robert and Elvira controlled the applicant.  AC, ¶ 78.

After its admission into the Program, JXM annually submitted reports to the SBA, which Margaux signed.  AC, ¶ 86.  These reports were also false.  Every year JXM was required to disclose to the SBA all non-disadvantaged persons who controlled JXM, but the JXM's reports never contained such disclosures. AC, ¶ 87. Every year Margaux also falsely certified that JXM met all eligibility requirements for a Section 8(a) concern.  One of those requirements was that

its president devote full time to managing the company, and Margaux knew she was doing almost no work for the company and no longer coming to JXM's offices.  AC, ¶¶ 90 – 91.  When she signed these reports, Margaux certified that the information contained therein was "TRUE, CORRECT AND ACCURATE." AC, ¶¶ 88.

As a result of the false annual reporting the SBA could not detect that JXM was ineligible for the Section 8(a) Program.  AC, ¶ 92.  Thereafter, JXM (and a joint venture it formed with MBM) bid on several contracts that were set aside for Section 8(a) participants.  Federal agencies awarded JXM or its joint venture seven such contracts.  AC, ¶ 94.  But for the fraudulent representations to the SBA, none of those contracts would have been awarded. AC, ¶ 95.

> 2. Defendants knowingly misrepresented MBM's business size

Relators allege that Defendants also violated the FCA when they sought and received contracts set aside for small business even though MBM and JXM were not "small" business with respect to those contracts.  Federal law requires every bid or application for a federal contract to a have certification, signed by an authorized official, regarding whether the applicant qualifies as a small business concern.  AC, ¶ 48, 15 U.S.C. §632(w)(3).  Further, federal contractors are required to certify on a government website the federal contracting programs for which their businesses qualify, and whether their business is a small concern in connection with the federal contracts sought.  AC, ¶ 109.  When a business misrepresents its small business status in a bid or proposal or in a federal electronic database, and subsequently obtains a contract reserved for a small business concern, there is a statutory presumption of loss to the United States of the "total amount expended on the contract." AC, ¶ 47, 15 U.S.C. § 632(w)(1).  Further, to prevent corporate manipulation of the size requirements, SBA regulations require the revenues of affiliated entities be combined when determining the size of those entities.  AC, ¶ 104.

JXM's and MBM's revenues exceeded the threshold for small businesses that provided janitorial services to the federal government. AC, ¶ 102. The SBA put JXM and MBM on notice that they were no longer small in September 2009 when it disqualified bids JXM's joint venture with MBM had submitted to provide housekeeping service on two U.S. Army bases due to violation of the size requirement. AC, ¶107. Despite such notification, JXM and MBM continued to represent themselves as small businesses on the federal website and continued to apply for janitorial services contracts reserved for small business concerns. AC, ¶ 111, 114. To avoid the SBA ruling Defendants created a second joint venture between MBM and JXM with a different name, even though such a ruse could not defeat the SBA's affiliation rules. AC, ¶¶ 112-13. MBM and the new joint venture bid on small business set aside contracts, expressly (and falsely) certifying that they were "small." AC, ¶ 114. Defendants knew the contracting agencies would rely on the express certifications as well as the representations regarding size they posted on the federal website. AC, ¶110, 115. As a result of these false representations MBM and the new joint venture were awarded two contracts for janitorial services where the contract solicitations expressly limited applicants to small business concerns. AC, ¶ 114.

## ARGUMENT

I.   **THE FCA'S MATERIALITY REQUREMENT IS SATISFIED WHEN MISREPRESENTATIONS CAUSE GOVERNMENT CONTRACTS TO BE AWARDED TO PERSONS WHO SHOULD NOT HAVE RECEIVED THEM**

A.   *In A Fraudulent Inducement Case, Materiality is Determined By Whether The False Statements Had A Natural Tendency to Influence or Were Capable of Influencing the Award of the Government Contract*

Relying heavily on an unpublished, uncited District Court decision out of the Western District of New York, *United States v. Strock*, 2019 WL 4640687 (W.D.N.Y, Sept. 24, 2019),[7]

---

[7] *Strock* has been appealed to the Second Circuit. *See United States v. Strock*, No. 19-4331 (2nd Cir.).

Defendants contend materiality hinges on whether Relators have established that the contractual requirements JXM and MBM avoided were conditions of payment and whether the government typically denies payment when federal contractors fail to meet those requirements.  Motion, ¶¶ 59 – 62.  But once again, Defendants fail to appreciate the difference between FCA cases premised on fraudulent inducement as opposed to fraudulent invoices.  And not surprisingly, materiality analysis in fraudulent inducement cases does not focus on the what the government did when it received invoices from the deceitful contractor, but whether the government would have disqualified the contractor or rejected its bid had it known the truth when the misrepresentations were originally made.

The correct way to analyze materiality in a fraudulent inducement case is set forth in *Longhi*, 575 F.3d at 471-72, the Fifth Circuit decision that confirmed that claims presented after a defendant fraudulently induced government entities to award a contract are false claims under the FCA.  *Id.* at 467-68.[8]  *Longhi* concerned defendants who obtained Small Business Innovation Research grants based upon applications that misrepresented the age and experience of the company, the company's facilities and equipment, its relationships with other institutions and laboratories and work it had previously done under an earlier grant received from the Air Force. Although there was no dispute that the defendants had performed the research proposed in the grant applications, the Court nonetheless found that misrepresentations in the grant applications satisfied the FCA's materiality requirement, and affirmed the District Court's grant of summary judgment in favor of the United States.

_____

[8] Although *Longhi* was decided before the Supreme Court's decision in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989 (2016), the Supreme Court approved the same standard for materiality that *Longhi* applied.  *U.S. ex rel. Harmon v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017).

In *Longhi*, the Fifth Circuit identified the proper test for materiality as being whether a false statement has "a natural tendency to influence or is capable of influencing the government's decision making." *Id.* at 471-72. The Court then applied the test it had articulated, declining to focus on the decision whether to pay a claim, but instead focusing on the decision to enter into the proposed contract. The misrepresentations were material because the defendants' "false statement had the potential to influence the . . . decision to award Lithium Power the SBIR grants." *Id* at 472.

Other circuits have reached comparable conclusions in fraudulent inducement cases. *See, United States ex rel. Miller v. Weston Educational, Inc.,* 840 F.3d 494, 504 (8th Cir. 2016) (in fraudulent inducement case materiality depends on whether defendant's promise "influenced government's decision to enter into its relationship" with defendant). *Cf. United States v. Luce*, 873 F.3d 999, 1007-09 (7th Cir. 2017) (where statute flatly prohibited Government from doing business with individuals who have a criminal record, defendant's failure to disclose pending indictment was material as a matter of law because defendant should have never participated in program).

When the focus is properly directed to whether the Defendants' misrepresentations affected the decision to contract, it is evident that Relators have sufficiently alleged materiality. The Amended Complaint alleges that Defendants only received the contracts at issue because they expressly misrepresented their eligibility. It is hard to imagine misrepresentations more calculated to influence the Government's decision to contract.

B.   The Factors Identified in *Escobar* and by the Fifth Circuit in its *Lemon* Decision Confirm that Defendants' Misrepresentations were Material

 Defendants urge this Court, *see* Motion at ¶ 54, to evaluate materiality by examining the factors identified by the Fifth Circuit in *U.S. ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155,

159-63 (5th Cir. 2019):  whether the requirement misrepresented was expressly stated to be a condition of payment; whether the government would have enforced the requirement; and whether the requirement at issue was minor or substantial.  These factors were in turn derived from the Supreme Court's materiality discussion in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, ___ U.S. ___, 136 S. Ct. 1989, 2002-03 (2016).  This analysis confirms that Defendants' misrepresentations were material.[9]

First, before Defendants ever responded to the solicitations for proposals, the contracting agencies limited the bidding competition to Section 8(a) participants, AC, ¶¶ 94. When strict eligibility requirements must be met before the prospective contractor can even submit a bid (and the bidder must certify compliance with those requirements in their proposals, AC, ¶¶ 48, 96), the requirements at issue are plainly conditions of payment.  Unless applicants meet the minimum requirements to contract, they can never be paid.  Although not determinative, the fact that the United States expressly required compliance with requirements at issue to obtain the contracts is probative evidence of materiality.  *Lemon*, 924 F.3d at 161.[10]

Relators have also sufficiently alleged that the government would have denied JXM's Section 8(a) application had it known the truth, the second *Lemon* factor.  The complaint describes the requirement that a Section 8(a) participant must be controlled by a disadvantaged

---

[9] In this section, Relators will only apply the *Lemon* factors to their claims relating to JXM's fraudulent admission into the Section 8(a) Program.  Given that Congress has legislatively determined that misrepresentation of business size is presumptively material, *see* Section I.C. *infra,* it is unnecessary to do the complete analysis with regard to Relator's claims that Defendants fraudulently obtained small business set aside contracts.  However, the Amended Complaint's allegations plainly establish that small business size was a condition of payment for the set aside contracts at issue, AC, ¶ 114; Defendants' bids would have been rejected had they disclosed that they were not small businesses, AC, ¶ 107, 115, 128; and the requirements are substantial, AC, ¶¶ 46-48; 15 U.S.C. § 632(w).

[10] Defendants assert that there is an important distinction between a condition of payment and a condition of program participation.  *See*, Motion at ¶ 55.  Prior to *Escobar*, some courts did hold that only conditions of payment were actionable under the FCA, while conditions of participation were not. *See*, *e.g. U.S. ex rel. Hobbs v. Medquest Assoc., Inc.*, 711 F.3d 707, 714 (6th Cir. 2011).  But *Escobar* made it clear that this distinction has no bearing on whether a misrepresentation is actionable under the FCA.  It held that "misrepresenting compliance with a condition of eligibility to even participate in a federal program" is actionable if the requirement is material.  136 S.Ct. at 2000-02.  Defendants do not appear to recognize this change in the jurisprudence or its significance to this case.

person, AC, ¶¶ 27-30, why Margaux did not control JXM in accordance with the relevant SBA regulations, AC, ¶¶ 59-62, 64, 66-68, 74, 89-91, and why Robert and Elvira, who actually controlled JXM, were not disadvantaged persons AC, ¶ 27-29, 54-55, 58, 68, 72, 74, 89-90. The complaint also alleges that the SBA actively took steps to stop the use of shell corporations or companies run by figureheads to prevent principals of Section 8(a) participants from evading the requirement that participation in the Program is limited to nine years. AC, ¶ 3, 41, 45

The Amended Complaint states that had the SBA known the truth, it would have been required to deny JXM's application, "[i]t had no discretion."  AC, ¶ 78.  This allegation is supported by the Amended Complaint's references to specific SBA regulations, AC, ¶¶ 21, 25 – 31, 42, as well as the complaint's description of an application and disclosure process designed to discover who actually controls the applicant, whether the disclosed principals are disadvantaged, and whether anyone involved in a prior Section 8(a) participant manages or controls the applicant.  AC, ¶¶ 38-45, 70-77, 86-88.  It is certainly plausible to conclude that after SBA went to the trouble of collecting and monitoring this information,[11] it would use it to determine who could be admitted to the Program.  Indeed, a federal statute requires the SBA to investigate credible information that a Section 8(a) participant is ineligible, and the SBA must initiate termination proceedings if it substantiates the information. 15 U.S.C. § 636(j)(10)(J)(i). And, the complaint alleges the Defendants deliberately hid Robert and Elvira's role in JXM and the relationship between JXM and MBM precisely because Defendants knew if the SBA learned

---

[11] This is an important fact distinguishing this case from *Strock,* 2019 WL 4640687, the primary authority relied upon by Defendants.  Unlike the veterans preference program in *Strock*, admission to the 8(a) Program is actively administered by a government agency, the SBA.  Applicants must go through a rigorous application process and the SBA is required to review the criteria at issue here and reject non-conforming applications.  The misrepresentations at issue here were made directly to the SBA and were made for the very purpose of hiding JXM's ineligibility.  In contrast, the service disabled veteran owned small business program in *Strock* was not administered by a government agency. *Id.* at *2.  Businesses self-certified their eligibility, which increased the likelihood that contractors might erroneously, but not fraudulently, misclassify themselves.

the facts, JXM's application would be rejected.  AC, ¶¶ 4, 58.  Evidence that Defendants knew the Government would consistently refuse to pay them due to noncompliance with a particular contractual requirement is "proof of materiality."  *Escobar*, 136 S.Ct. at 2003.[12]

A third factor considered in the materiality analysis is whether the requirement is minor or substantial.  *Lemon*, 924 F.3d at 162.  Materiality is more likely to be found when the information at issue goes to the very essence of the bargain.  *Escobar*, 136 S. Ct. at 2003, n. 5.  The requirements at issue are substantial.  It defies logic to believe that when Congress created an extensive (and expensive) program to identify disadvantaged businesses that should receive contracting preferences, it never intended those preferences to be enforced.

Express Congressional findings leave no doubt that Congress did not view these programs as routine procurement guidelines to be set aside if a better deal could be had.  Congress declared that "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups" and that "such development can be materially advanced through the procurement by the United States of [goods and services] from such concerns."  15 U.S.C. § 631(f)(1) (D) and (F).  This national interest cannot be accomplished by awarding contracts set aside for disadvantaged groups to businesses controlled by non-disadvantaged persons.

Section 8(a) set aside contracts are not about the United States getting goods and services at the best price; the essence of the bargain is that the contracts' economic benefits be directed to the persons identified by Congress.  The requirements at issue are indisputably material.

---

[12] Relying on *Strock*, 2019 WL 4640687 at *10, Defendants argue that Relators must affirmatively establish that the United States regularly pursues enforcement actions against companies that have misrepresented their Section 8(a) eligibility.  Motion at ¶ 60.  In *Lemon,* however, the Fifth Circuit, citing *U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.* 892 F.3d 822, 834 (6th Cir. 2018), expressly rejected any such pleading requirement in FCA cases, 934 F.3d at 182.

C.      Congress has Definitively Determined that Misrepresentation of Business Size is
        Material

The materiality analysis with regard to Defendants' misrepresentation of the entities'

small business status is even more straightforward:  Congress has made a legislative decision that

all misrepresentations of small business size in connection with the award of small business set

aside contracts are material.  Pursuant to 15 U.S.C. § 632(w)(1), Congress has determined that in

"every contract. . . set aside, reserved or otherwise classified as intended for award to small

business concerns" whenever it is established that "a business concern other than a small

business concern willfully sought and received the award by misrepresentation"[13] there "shall be

a presumption of loss to the United States based on the total amount expended on the contract."

Not only has Congress deemed the nation to be damaged when such contracts are hijacked by

entities that misrepresent their size, but the amount of the damage is every dollar paid.

Here Relators allege that due to their excessive revenues and affiliation, MBM and JXM

were not small business concerns in connection with contracts for janitorial services.  AC, ¶¶ 102

-04.  Even though Defendants were informed that the entities were no longer small by the SBA,

AC, ¶ 107, Defendants did not change the express representation of small business status on the

federal website, and expressly certified that MBM and the new joint venture was small in in bids

and proposals Defendants made for small business set aside contracts, AC, ¶¶ 111-12, 114-15.

Such actions constitute the willful seeking and receipt of contract awards through a

misrepresentation of size pursuant to 15 U.S.C. § 631(w), and consequently this Court must

presume that the United States was damaged when MBM and its joint venture was awarded the

---

[13] The statute further provides the submitting a bid or proposal for a federal contract set aside or otherwise intended to be awarded to a small business concern, as well as registering as a small business concern on any federal electronic database for the purpose of being considered for an award of a federal contract are "affirmative, willful and intentional certifications of small business size."  15 U.S.C. § 631(w)(2).

small business set aside contracts identified in the Amended Complaint.  No further materiality

analysis is necessary (or could reach a contrary conclusion).

> D.  The Amended Complaint Does Not Allege that the Army or the Air Force Had
> Actual Knowledge that MBM Was Not a Small Business

The Supreme Court in *Escobar* observed that "if the Government pays a particular claim

in full despite its actual knowledge that certain requirements were violated, that is very strong

evidence that those requirements are not material." 136 Ct. at 2003. Defendants claim that the

Amended Complaint conclusively establishes that Defendants' size representations were

immaterial because MBM was nonetheless awarded contracts reserved for small businesses after

the SBA disqualified JXM's bids because the JXM joint venture was too large.  Defendants'

argument makes no sense.  The SBA disqualified Defendant's bids because it had actual

knowledge that the entities were too large.   AC, ¶ 109.  The Army and the Air Force awarded set

aside contracts to MBM and its joint venture because they did not know MBM and its joint

venture were not small business concerns, but instead relied on Defendants' false representations

of size. AC, ¶¶ 110, 115, 128.  Accepting the complaint's allegations as true, there is no

evidence that any part of the government sanctioned the award of small business set aside

contracts to concerns that were not small.

The "actual knowledge" defense requires the government agency actually paying the

claim to be the entity that has the "knowledge."  In *Escobar*, after the Supreme Court remanded

the case to the First Circuit, the defendants sought dismissal because one state government

branch knew the about licensing violations alleged to be material, but the Massachusetts

Medicaid program continued to pay the defendants' claims.  *U.S. ex rel. Escobar v. Universal

Health Services, Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("*Escobar II*").  The knowledge of some

state regulators, however, was not equivalent to the governmental department that paid the

claims having actual knowledge.  Because there was "no evidence that MassHealth had actual

knowledge of the violations at the time it paid the claims at issue," the Court declined to even

consider whether such knowledge would render the misrepresentations immaterial at the

pleading stage.  *Id*.  *See also U.S. ex rel. Harmon v. Trinity Indus., Inc.*, 872 F.3d 645, 661 (5th

Cir. 2017) (discussing *Escobar II*, and acknowledging that courts examine whether "the *relevant*

*government agency* had actual knowledge of any violations when it decided to pay the claims,"

emphasis added)

Here, there is no basis to conclude that the Army or the Air Force awarded the set aside

contracts with actual knowledge that MBM or its joint venture were ineligible.[14]

## II. THE COMPLAINT SUFFICIENTLY ALLEGES MARGAUX XIMENES' SCIENTER

Defendants also contend that Relators' allegations relating to Margaux Ximenes' scienter

do not meet Rule 9(b)'s heightened pleading requirements.  But the specificity requirements that

apply to allegations setting forth the circumstances of the fraud do not apply to scienter pleading.

Rule 9(b) only requires allegations regarding a fraud defendant's intent and knowledge be pled

generally.  *Bollinger Shipyards*, 775 F.3d at 261.  Nor were Relators required to plead that

Margaux had actual knowledge that the information she certified to United States was false; the

FCA is satisfied if the facts alleged can lead to the conclusion that Margaux acted with reckless

disregard for the information's truth or falsity.  *Id.* And, of course, on ruling on Defendants'

motion, the allegations must be viewed in the light most favorable to the Relators and all

---

[14] Defendants also contend that the SBA's alleged actual knowledge establishes that all Defendants lacked the requisite scienter.  *See* Motion at ¶ 65, n. 8.   A lack of scienter may exist when Defendants knew the statements are false, and also knew that the government knew of the falsity and was willing to pay anyway.  *U.S. ex rel. Colquitt v. Abbott Laboratories*, 858 F.3d 365, 379-80 (5th Cir. 2017); *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263-64 (5th Cir. 2014).  Putting aside that the complaint does not allege that the government agencies had actual knowledge or that Defendants relied upon the government's knowledge—the Fifth Circuit has ruled this fact intensive defense is not appropriate at the motion to dismiss stage.  *Bollinger Shipyards*, 775 F.3d at 264.

inferences from the alleged facts need to be drawn in the Relators' favor.  *Id.* at 261, 263 and
264.  Viewed in light of these review standards, Relators have plainly satisfied their scienter
pleading burden with regard to Margaux.[15]

Defendants fault Relators for not specifically alleging that Margaux was aware of the
Section 8(a) qualification requirements and therefore she could not have known that the
certifications she was making were false.  But in JXM's application to the 8(a) Program, and in
its annual reports to the SBA, Margaux certified the truth and accuracy of information she knew
to be untrue.  She knew she did not devote full time to the management of JXM, AC, ¶¶ 64, 73,
90-91; that Robert and Elvira were part of the management team of JXM; AC, ¶ 55,72; that she
did not have access to JXM's bank accounts, AC, ¶¶ 62, 74; that MBM provided office space to
JXM, AC, ¶¶ 66, 75; that she never provided any capital to JXM, AC, ¶¶ 58, 75; and that JXM
provided a fictitious address to the SBA, AC, ¶¶ 65-66; 70.  Given the limited time she devoted
to the company, AC, ¶¶ 64, 66-67, 90-91 and her limited duties, AC, ¶¶ 66, 67, she certainly
knew she did not control JXM, AC, ¶¶ 76.  Nonetheless she provided false information to the
SBA on all of these topics. AC, ¶¶ 70-76, 87, 91. These allegations sufficiently allege that she
had actual knowledge that the representations at issue were false.

With regard to misinformation provided to the SBA that Margaux may not personally
have known to be false, she nonetheless certified its truth and accuracy,  AC, ¶¶ 77, 88. And she
did so without conducting any investigation as to the information's truth or accuracy.  AC, ¶ 80.
Certifying the truth and accuracy of information without knowing whether or not the statements

---

[15] Defendants do not contest the scienter allegations concerning the other Defendants (other than to erroneously assert that the SBA's notice that JXM was not a small business negates scienter with regard to the small business size misrepresentation claims.  *But see*, n. 13, *supra*.).  Accordingly, if Relators' scienter pleading is defective, only their claims against Margaux would be affected; the action would continue against JXM, MBM, Robert and Elvira.

were true is a textbook example of acting in reckless disregard (or deliberate ignorance) of the truth or falsity of the information.

Defendants' argue that because the Amended Complaint alleges that Margaux was inexperienced and had a nominal role in JXM, Relators' allegations that Margaux "should have known" the truth are unsupportable.  Motion at ¶ 51.  Defendants misconstrue Relators' "should have known" allegations.  Relators do not contend that Margaux should have known the truth because an experienced corporate executive in her position would have known it; Relators contend that Margaux should have known the truth because she voluntarily certified to the United States that the information was true and accurate.  Defendants ignore the significance of making such a certification.  If the Court were to accept Defendants' position, a certification made to the United States would have no value because there would be no consequences for providing a certification without any inquiry as the truth of the matters certified.   If Margaux had no idea whether the information was true or correct, she should have refused to certify.

Defendants also contend there are no allegations establishing that Margaux knew the information she provided to the United States was material.  But by submitting the certifications to the SBA, Margaux knew she was providing information sought by the United States to determine if JXM would be eligible (or remain eligible) to participate in a government program that provided JXM access to valuable government contracts.  And she was aware that the United States required the accuracy of the information to be certified.  This is sufficient information to have alerted her the information she was going to provide would likely influence the SBA's decision to admit or maintain JXM in the Section 8(a) program.

Further, the complaint alleges that the Defendants, including Margaux, deliberately provided false information in the Section 8(a) application intending the SBA to rely upon it in

deciding whether to admit JXM into the Program.  AC, ¶ 69.  For example, Margaux knew the documents she signed concealed Robert and Elvira's management and control of JXM as well as the relationship between JXM and MBM.  Yet she took no steps to correct these omissions, and she knowingly certified false information.  The complaint plausibly alleges Margaux and the other defendants concealed the truth because Defendants knew if the SBA learned that Elvira and Robert controlled a second Section 8(a) applicant it would deny JXM's application into the lucrative program.  AC, ¶ 4, 58, 65, 78, 79 and 92.  Such allegations establish that Margaux and the other defendants knew the concealed information was material.

## III.   IF PLEADING DEFICIENCIES EXIST, RELATORS SHOULD BE ALLOWED TO CORRECT THEM

To the extent this Court grants Defendants relief based on a ground not raised in Defendants' original Rule 12(c) motion, Relators should be given leave to amend to address any identified deficiencies.  Defendants could have raised the materiality and lack of scienter defenses in their original motion, and Relators then would have been able to address those asserted flaws in their Amended Complaint.  Defendants, however, delayed raising these defenses and there is no reason Relators should not be allowed at least one opportunity to correct any pleading deficiencies relating to the new defenses.  It is in the interests of justice to allow Relators to remedy correctible pleading errors, particularly when the errors have not been previously identified.

## CONCLUSION

WHEREFORE, this Court should deny Defendants' Motion in its entirety, which will allow discovery to recommence.

Dated: June 30, 2020                           By their attorneys,

                                               RELATORS ELIZABETH HUDSON and
                                               DANIEL MONTES, JR.

                                               */s/ Michael Tabb*
                                               Thomas M. Greene
                                               Mass. BBO# 210020*
                                               tgreene@greenellp.com
                                               Michael Tabb
                                               Mass. BBO# 491310*
                                               matabb@greenellp.com
                                               Ryan P. Morrison
                                               Mass. BBO# 680238*
                                               rmorrison@greenellp.com
                                               **GREENE**LLP
                                               One Liberty Square, Suite 1200
                                               Boston, MA 02109
                                               (617) 261-0040 (Telephone)
                                               (617) 507-6559 (Facsimile)
                                               *admitted pro hac vice*

                                               Charles S. Siegel
                                               Texas State Bar No. 18341875
                                               siegel@waterskraus.com
                                               Caitlyn E. Silhan
                                               Texas State Bar No. 24072879
                                               csilhan@waterskraus.com
                                               Waters & Kraus, LLP
                                               3219 McKinney Avenue
                                               Dallas, TX 75204
                                               (214) 357-6244 (Telephone)
                                               (214) 871-2263 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that, on June 30, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

Dated: June 30, 2020                           */s/ Michael Tabb*
                                               Michael Tabb